WYODAK RESOURCES DEVELOPMENT CORP., Appellant (Petitioner),

v.

The STATE BOARD OF EQUALIZATION, for the State of Wyoming, and the Wyoming Department of Revenue, Appellees (Respondents).

No. 99–251.

Supreme Court of Wyoming.

Aug. 14, 2000.

Representing Appellant: Timothy L. Thomas of Morrill Thomas Nooney & Braun, LLP, Rapid City, South Dakota.

Representing Appellee: Vicci Colgan, Chief Deputy Attorney General; Rowena L. Heckert, Deputy Attorney General; and Karl D. Anderson, Assistant Attorney General.

Before LEHMAN, C.J., and THOMAS, MACY,* GOLDEN and HILL, JJ.

MACY, Justice.

Appellant Wyodak Resources Development Corp. (Wyodak) appealed to the State Board of Equalization [1] from the Department of Audit's findings that were adopted by Appellee Wyoming Department of Revenue. The audit involved Wyodak's coal mining operations at its Campbell County mine from 1990 through 1992 and resulted in an increased taxable value of coal production for ad valorem tax purposes for the period. The State Board of Equalization affirmed, and Wyodak appealed to the district court. The district court certified the case to the Wyoming Supreme Court pursuant to W.R.A.P. 12.09(b).

We affirm.

## ISSUES

Wyodak presents a single issue for our review:

I. Did the Wyoming State Board of Equalization err in affirming the Department of Revenue determination that Petitioner's road move expenses incurred during coal production years 1990–1992 were direct mining costs rather than indirect costs for purposes of valuing Petitioner's coal production during those same years under Wyo. Stat. § 39-2-209(d)?

## FACTS

Wyodak operated a surface coal mine near Gillette. In 1951, it granted a right-of-way to the State of Wyoming across a portion of its property to be used as a section of State Highway 51. Under the terms of the agreement, Wyodak reserved the right to mine the coal located under and around the right-of-way so long as it provided an adequate detour satisfactory to the state at its own expense.

In 1988, Wyodak became interested in mining the coal under and around the right-of-way, and it entered into an agreement with the State Highway Commission of Wyoming to relocate the highway. The highway was moved, and, in 1989, Wyodak reported $687,975 of indirect costs associated with this relocation in valuing its coal production for tax purposes.

In its 1990 production year, Wyodak reported an additional $54,525 of expenses that were associated with this relocation and again classified them as indirect costs. In 1991, Wyodak accrued $750,839 in expenses that it intended to use to fund and construct the permanent replacement of the highway, which actually would not occur until sometime in the future. Wyodak classified these accrued amounts as indirect costs.

In December of 1991, Wyodak sent a letter to the Wyoming Highway Department wherein it explained that it planned to begin hauling overburden on State Highway 51 across the first temporary relocation. Wyodak requested approval for a second temporary relocation of the highway so that it could "maximize the removal of coal affected by State Highway 51" pursuant to the 1988 agreement. The Wyoming Transportation

---

* Retired June 2, 2000.

1. Although the State Board of Equalization is listed as a party in the caption of this case, it properly did not file a brief or appear at oral arguments in accordance with our directives in *Antelope Valley Improvement v. State Board of Equalization for State of Wyoming*, 992 P.2d 563 (Wyo.1999), and our opinion on the petition for clarification, 4 P.3d 876 (Wyo. 2000).

Commission denied Wyodak's proposed temporary detour but suggested an alternative detour, which Wyodak accepted and constructed in 1992. In 1992, Wyodak reported $586,026 in indirect mining costs for the expenses related to this second temporary relocation.

In 1995, the Department of Audit audited Wyodak's operations for the period of 1990 through 1992. On the basis of Wyo. Stat. Ann. § 39–2–209(d)(ii) (Michie 1997) (repealed & recreated at § 39–14–103(b)(vii)(B) in 1998), the Department of Audit disagreed with Wyodak's classification of the 1990, 1991, and 1992 costs associated with the relocation of State Highway 51 as indirect mining costs and reclassified them as direct costs for the purpose of production tax valuation. The Department of Audit's findings resulted in increased severance taxes for the years 1990 through 1992, and the Department of Revenue issued a final assessment notice for the severance tax underpayments.

Wyodak appealed from this assessment to the State Board of Equalization, arguing that the costs should be classified as indirect mining costs. The State Board of Equalization affirmed the classification of the costs as direct mining costs, and Wyodak appealed to the district court. The district court certified the case to the Wyoming Supreme Court pursuant to W.R.A.P. 12.09(b).

### STANDARD OF REVIEW

 When an administrative decision is certified to the Wyoming Supreme Court pursuant to W.R.A.P. 12.09(b), we apply the appellate standards which are applicable to the court of the first instance. *Petroleum Inc. v. State ex rel. State Board of Equalization*, 983 P.2d 1237, 1239 (Wyo.1999). Wyo. Stat. Ann. § 16–3–114(c) (LEXIS 1999) governs judicial review of administrative decisions. W.R.A.P. 12.09(a); *Everheart v. S & L Industrial*, 957 P.2d 847, 851 (Wyo.1998). If substantial evidence supports an agency's findings, we will not substitute our judgment for that of the agency. *Peter Kiewit Sons' Co. v. Sheridan County Board of Commissioners (In re Dunning)*, 982 P.2d 704, 707 (Wyo.1999). If the agency's conclusions of law are in accordance with the law, this

Court will affirm them. *Corman v. State ex rel. Wyoming Workers' Compensation Division*, 909 P.2d 966, 970 (Wyo.1996). When an agency has not invoked or properly applied the correct rule of law, we will correct the error. *Petroleum Inc.*, 983 P.2d at 1239.

### DISCUSSION

The single issue to be resolved in this case is whether the expenses associated with the movement of State Highway 51 should be classified as direct or indirect costs in the computation of the taxable value of Wyodak's coal production. Of significant impact on our analysis of this case is the 1988 agreement Wyodak entered into with the State Highway Commission regarding the extraction of the coal beneath and surrounding the right-of-way. That agreement provided in pertinent part:

> Under the terms of the right-of-way easement the grant is subject to a condition and reservation of the grantor, the successor in interest of which is the Company, wherein the grantor reserved the right to own and mine the coal by either underground or surface operations as located under and around State Highway 51 and right-of-way; provided, the right to mine is on the condition that the grantor at its own cost and expense shall first provide a detour satisfactory to the State for use by the public as a highway in lieu of the portion of said right-of-way which would be rendered unsafe or unfair for public highway purposes because of the mining operations, and that upon completion of such operations, the grantor is to replace the highway at a similar or same location.

The legislature provided significant guidance for the determination of whether costs incurred by a coal producer are direct or indirect mining costs when it enacted Wyo. Stat. Ann. § 39–2–209(d) (Michie 1997) (repealed & recreated at § 39–14–103(b)(vii)(A–D) & § 39–14–101(a)(viii) in 1998). Under this statute, which applied to all mineral production on or after January 1, 1990, the terms "direct costs" and "indirect costs" were specifically defined. Before its repeal

and recreation in 1998, § 39–2–209(d) provided in pertinent part:

(d) For coal sold away from the mouth of the mine pursuant to a bona fide arms-length sale, the department shall calculate the fair cash market value of coal by multiplying the sales value of extracted coal, less transportation to market provided by a third party to the extent included in sales value, all royalties, ad valorem production taxes, severance taxes, black lung excise taxes and abandoned mine lands fees, by the ratio of direct mining costs to total direct costs. Nonexempt royalties, ad valorem production taxes, severance taxes, black lung excise taxes and abandoned mine lands fees shall then be added to determine fair market value. For purposes of this subsection:

. . .,

(ii) Direct mining costs include mining labor including mine foremen and supervisory personnel whose primary responsibility is extraction of coal, supplies used for mining, mining equipment depreciation, fuel, power and other utilities used for mining, maintenance of mining equipment, coal transportation from the point of severance to the mouth of the mine, and any other direct costs incurred prior to the mouth of the mine that are specifically attributable to the mining operation;

(iii) Total direct costs include direct mining costs determined under paragraph (ii) of this subsection plus mineral processing labor including plant foremen and supervisory personnel whose primary responsibility is processing coal, supplies used for processing, processing plant and equipment depreciation, fuel, power and other utilities used for processing, maintenance of processing equipment, coal transportation from the mouth of the mine to the point of shipment, coal transportation to market to the extent included in the price and provided by the producer, and any other direct costs incurred that are specifically attributable to the mining, processing or transportation of coal up to the point of loading for shipment to market;

(iv) Indirect costs, royalties, ad valorem production taxes, severance taxes, black lung excise taxes and abandoned mine lands fees shall not be included in the computation of the ratio set forth in this subsection. Indirect costs include but are not limited to allocations of corporate overhead, data processing costs, accounting, legal and clerical costs, and other general and administrative costs which cannot be specifically attributed to an operational function without allocation[.]

This method attempted to value coal production at the "mouth of the mine" in order to establish the value of the coal that was solely attributable to the mining operations. *Amax Coal Company v. Wyoming State Board of Equalization*, 819 P.2d 825, 827 (Wyo.1991).

■ Wyodak asserts that the road relocation costs were better classified as indirect costs which "cannot be specifically attributed to an operational function without allocation." We disagree. The agreement dictates that, before Wyodak could mine the coal under and around the right-of-way, it had to incur relocation and replacement expenses. They were necessary expenses of extracting the coal and were, therefore, specifically attributable to Wyodak's mining operation.

Wyodak also contends that the relocation costs should not be considered direct costs because they were extraordinary, amounting to "*almost half* of the total overburden removal costs for the entire 1990 production year." The term "extraordinary expenses" has not been defined, nor have extraordinary expenses been specifically exempted from the definition of direct costs. We are not convinced that *Hillard v. Big Horn Coal Company*, 549 P.2d 293, 298 (Wyo.1976), supports Wyodak's argument that extraordinary expenses should be treated as indirect costs. As the Department of Revenue points out, although the opinion does acknowledge that coal producers do incur indirect costs not attributable to their mining, the case does not declare extraordinary costs as indirect costs in nature. We conclude that the fact that the relocation costs were substantial is inconsequential to whether they were properly classified as direct or indirect costs.

Wyodak complains that the reclassification of these costs from indirect to direct was inconsistent with how they were treated in 1989 when most of the costs associated with the first relocation were categorized as indirect costs. Any concern we had about this inconsistency was resolved once we realized that § 39–2–209(d), which specifically defined the two types of costs, did not go into effect until the 1990 production year.

Wyodak next asserts that the 1991 expenses were actually accruals of expenses that will be incurred to move State Highway 51 back to its original location, which will not occur until sometime in the future. It insists that these accruals should not be classified as direct costs because they could not have been incurred prior to the mouth of the mine. The Department of Revenue counters that the accrued costs were, by virtue of the agreement, specifically attributable to the mining operations to extract the coal under and around the right-of-way.

Wyodak relies on a State Board of Equalization opinion in *In re Appeal of Exxon Coal U.S.A., Inc.*, No. 93–107, 1994 WL 569436 (Wyo.St.Bd.Eq. Oct. 6, 1994), to support its argument that accrued costs should not be classified as direct costs. In that case, the issue presented was whether Exxon Coal's final reclamation accruals should have been classified as indirect costs pursuant to § 39–2–209(d)(iv). The State Board of Equalization concluded:

> 7. The crux of the issue presented concerns interpretation of whether final reclamation accruals by Petitioner "are specifically attributable" to mining, processing or transportation of coal" [W.S. 39–2–209(d)(ii), 209(d)(iii) ], or "cannot be specifically attributed to an operational function without allocation," W.S. 39–2–209(d)(iv). If the accruals are "specifically attributable" to one of the three described functions, they are considered "direct" costs and are utilized in deriving a direct cost ratio. On the other hand, if the accruals "cannot be specifically attributed ... without allocation," the same are indirect costs and are allocated by the direct cost ratio. It is our conclusion these reclamation accruals cannot be attributed to an opera-

> tional function without allocation, and therefore are indirect costs to be allocated to taxable value by the direct cost ratio.

> 8. Initially we should emphasize the costs at issue are "final reclamation accruals," as opposed to the costs of annual, ongoing reclamation, which both the Department and Petitioner agree are direct costs, and thus utilized in the direct cost ratio. Final reclamation accruals differ however in that they are not current, out-of-pocket expenses, but rather estimates of the final costs for reclaiming the entire mine site upon the secession of mining operations....

*In re Appeal of Exxon Coal U.S.A., Inc.*, 1994 WL 569436, at *2–*3.

In that case, Exxon Coal made yearly accruals for its final reclamation costs. *In re Appeal of Exxon Coal, U.S.A., Inc.*, 1994 WL 569436, at *2. In the case at bar, the accrued expenses were not an estimate for reclaiming the entire mine site. As the State Board of Equalization pointed out in its order in this case, "reclamation by definition indicates the process of returning something to a natural state.... [S]ince Petitioner was returning a man-made object, specifically State Highway 51, to a prior location, a reclamation argument is inapposite." We concur and add that the 1988 agreement forces the conclusion that the relocation and replacement expenses were direct costs because they were or will be incurred as a condition of mining the specific coal under and around the right-of-way. Wyodak moved the highway so that it could mine the coal. The fact that ongoing mining operations precluded the highway's immediate and permanent replacement, resulting in the accrual of the final replacement costs, does not change the logical conclusion that the costs were specifically attributable to the mining operations.

■ Wyodak contends that the costs associated with the second relocation occurred over a previously mined and reclaimed area and, therefore, could not have been incurred prior to the mouth of the mine. It also insists that these costs were incurred because of the Wyoming Transportation Commission's safety and convenience concerns. The Department of Revenue replies that this

second relocation was in no way different from the first and that the costs associated therewith should be treated accordingly.

The relevant provision of the 1988 agreement stated:

> 2.2 *Second Temporary Relocation.* The State acknowledges that in order for the Company to maximize the removal of coal affected by State Highway 51 ... it will be necessary to cause the State to relocate State Highway 51 to the Second Temporary Relocation in approximately 5 years after State Highway 51 is relocated to the First Temporary Relocation. The State does not at this time approve the relocation of State Highway 51 to the Second Temporary Relocation, but does agree to seriously consider giving such permission at a later time when required by the Company to continue its mining operations.

Although the Wyoming Transportation Commission denied Wyodak's proposed relocation site, it proposed an alternative route to the south, which Wyodak accepted. Wyodak would have incurred the expenses regardless of which route was utilized. This relocation was, by agreement, for the purpose of allowing Wyodak to maximize the removal of the coal, and it necessarily follows that the associated expenses were properly classified as direct costs.

## CONCLUSION

The expenses at issue in this case were, by agreement, specifically attributable to the mining operation rather than general and administrative costs which could not be specifically attributed to an operational function without allocation. They were, therefore, properly classified as direct costs and correctly considered in determining the taxable value of the coal production from this mine.

Affirmed.