2002 WY 5

**POWDER RIVER COAL COMPANY,**
Appellant (Petitioner),

v.

**WYOMING STATE BOARD OF EQUAL-IZATION and Wyoming Department of Revenue, Appellees (Respondents).**

No. 00–282.

Supreme Court of Wyoming.

Jan. 17, 2002.

Rehearing Denied Feb. 27, 2002.

Lawrence J. Wolfe, P.C.; Patrick R. Day, P.C.; and Melissa L. Hughes of Holland & Hart LLP, Cheyenne, WY, Representing Appellant.

Gay Woodhouse, Attorney General; Rowena L. Heckert, Deputy Attorney General; and Karl D. Anderson, Assistant Attorney General, Representing Appellee Wyoming Department of Revenue.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1]   Powder River Coal Company (taxpayer) challenges the Wyoming Department of Revenue's (Department) valuation of its coal production for ad valorem and severance tax purposes, as affirmed by the Wyoming State Board of Equalization (Board).  The taxpayer contends the bonus it paid to the federal government when it purchased the federal coal lease was the same as a royalty and should have been treated as such in the application of the proportionate profits calculation required by the statute and regulations.  In the alternative, the taxpayer argues the bonus is an indirect, rather than a direct, mining cost under the statute.  We agree with the Department that a lease bonus is not a royalty.  However, we also agree with the taxpayer that the bonus is not a direct mining cost as contemplated by the statute and regulations.  Therefore, we affirm in part, reverse in part, and remand.

## ISSUES

[¶ 2] The taxpayer frames these issues:

A. Is the taxation of lease bonus payments which Powder River Coal Company, as lessee, made to the United States, as lessor, in order to acquire a federal coal lease, a violation of Article 15 § 12 of the Wyoming Constitution which prohibits taxation of federal interests in property?

B. Are lease bonus payments properly classified as royalties to avoid an unconstitutional tax for purposes of determining the severance and ad valorem taxes payable on coal mined from a federal coal lease?

C. Are lease bonus payments properly classified as royalties rather than direct mining costs for purposes of determining the severance and ad valorem taxes payable on coal mined?

The Department restates the issues:

[A]. For Wyoming coal tax valuation purposes, are federal coal lease bonus payments analogous with exempt federal royalties?

[B]. Are federal coal lease bonus payments properly treated as direct mining costs under Wyo. Stat. § 39-2-209(d) currently recodified at Wyo. Stat. § 39-14-103(b)(vii)?

In its reply brief, the taxpayer reiterates the following question:

Since the Department argues that the costs for FLBPs [federal lease bonus payments] are not related to production, the FLBPs cannot be direct mining costs. FLBPs are royalties or should be treated as indirect costs.

## FACTS

[¶ 3] In 1992, the taxpayer successfully bid on a federal coal lease by offering $86,987,765 in bonus payments. The lease also required payment of a 12½ percent royalty on any production. The Mineral Leasing Act of 1920 authorizes the Secretary of the Interior to dispose of coal reserved by the federal government through a complicated and competitive bidding process. Historically, the bonus bid was viewed as a token payment, often in the range of $1 to $10 per acre, and the remainder of the value of the coal was realized through the royalty payments. In 1976, Congress passed the Federal Coal Leasing Amendments Act which mandated no federal coal lease could be sold for less than fair market value as determined by the Secretary of the Interior. Fair market value is defined as "that amount in cash, or on terms reasonably equivalent to cash, for which in all probability the coal deposit would be sold or leased by a knowledgeable owner willing but not obligated to sell or lease to a knowledgeable purchaser who desires but is not obligated to buy or lease." 43 C.F.R. § 3400.0–5(n) (2000). The current bidding system requires a fixed cash bonus and acceptance of the statutory minimum fixed royalty of 12½ percent. 43 C.F.R. §§ 3422, 3473.3–2(a)(1) (2000). The federal regulations define bonus as "that value in excess of the rentals and royalties that accrues to the United States because of coal resource ownership that is paid as part of the consideration for receiving a lease." 43 C.F.R. § 3400.0–5(c) (2000).

[¶ 4] In all years prior to 1996, the taxpayer filed its Annual Gross Products Report for Coal for its Rochelle Mine treating the amortized bonus payment as a direct mining cost in the statutory formula used to determine the value of the gross product mined. In 1996, the taxpayer changed its reporting procedure and amortized the bonus payment treating it as an exempt federal royalty payment. The Department promptly reclassified the amortized bonus payment as a direct mining cost and issued a Notice of Valuation on June 19, 1997. The taxpayer appealed its Notice of Valuation to the Board which considered the matter based on briefs and supporting documents. The taxpayer contended the bonus payments were royalty payments exempt under the Wyoming statutes and the constitution. The Department disagreed and contended the taxpayer had not met its burden of proof to show that treatment of the bonus payments as a direct mining cost was arbitrary, capricious, or an abuse of discretion. On appeal, the Board affirmed the Department's valuation. The taxpayer filed a petition for review which the district court certified to this court.

## STANDARD OF REVIEW

[¶ 5] When we review cases certified pursuant to W.R.A.P. 12.09(b), we apply the appellate standards which are applicable to the court of the first instance. *State by and through Wyoming Department of Revenue v. Buggy Bath Unlimited, Inc.*, 2001 WY 27, ¶ 5, 18 P.3d 1182, ¶ 5 (Wyo.2001); *see also Union Telephone Company, Inc. v. Wyoming Public Service Commission*, 907 P.2d 340, 341–42 (Wyo.1995). Judicial review of administrative decisions is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2001). *Buggy Bath Unlimited, Inc.*, ¶ 5; W.R.A.P. 12.09(a); *Everheart v. S & L Industrial*, 957 P.2d 847, 851 (Wyo.1998).

[¶ 6] The issues in this case— whether a bonus payment should be treated as an exempt royalty and, if not, whether it constitutes a direct or indirect cost of mining for mineral valuation and taxation purposes—present pure questions of law. Their resolution requires interpretation of the applicable statutes and Department rules. Statutory interpretation is a question of law which we review *de novo*. *Chevron U.S.A., Inc. v. State*, 918 P.2d 980, 983 (Wyo.1996). We affirm an agency's conclusions of law when they are in accordance with the law. *Buggy Bath Unlimited, Inc.*, ¶ 6. However, when the agency has failed to properly invoke and apply the correct rule of law, we correct the agency's error. *Id.* The rules of statutory interpretation also apply to the interpretation of administrative rules and regulations. *Id.* These rules are often cited and are well recognized:

> We first decide whether the statute is clear or ambiguous. This Court makes that determination as a matter of law. A "statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability." *Allied–Signal, Inc.* [*v. Wyoming State Board of Equalization*], 813 P.2d [214,] 220 [ (Wyo.1991) ]. A "statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations." 813 P.2d at 219–20.
>
> If we determine that a statute is clear and unambiguous, we give effect to the plain language of the statute.

> We begin by making an "'inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection.'" *Parker Land and Cattle Company v. Wyoming Game and Fish Commission*, 845 P.2d 1040, 1042 (Wyo.1993) (quoting *Rasmussen v. Baker*, 7 Wyo. 117, 133, 50 P. 819, 823 (1897)). We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe together all parts of the statute *in pari materia*.

*State Department of Revenue and Taxation v. Pacificorp*, 872 P.2d 1163, 1166 (Wyo.1994). If we determine that the statute is ambiguous, we resort to general principles of statutory construction to determine the legislature's intent.

*State v. Bannon Energy Corporation*, 999 P.2d 1306, 1308–09 (Wyo.2000) (some citations omitted).

## DISCUSSION

[¶ 7] The genesis of this dispute lies in the constitutional and statutory construct for the taxation of minerals in Wyoming. The Wyoming Constitution provides that all mines "shall be taxed ... in lieu of taxes on the lands[ ] on the gross product thereof ...; provided, that the product of all mines shall be taxed in proportion to the value thereof." Wyo. Const. art. 15, § 3. The statutes then impose ad valorem and severance taxes upon the value of the gross product mined. Wyo. Stat. Ann. §§ 39–13–103, 39–14–103 (LexisNexis 2001). "The value of the gross product shall be the fair market value of the product at the mouth of the mine where produced, after the mining or production process is completed." Section 39–14–103(b)(ii). The mining or production process is deemed complete when the mineral product reaches the mouth of the mine, and "[i]n no event shall the value of the mineral product include any processing functions or operations regardless of where the processing is performed." Section 39–14–103(b)(iii). The mouth of the mine is defined as "the point at which a mineral is brought to the surface of the ground and is taken out of the pit.... For a surface mine, this point shall be the top of

the ramp where the road or conveying system leaves the pit." Wyo. Stat. Ann. § 39–14–101(a)(vi) (LexisNexis 2001). Processing is defined as crushing, storing, loading for shipment, transportation from the mouth of the mine to the loadout, and similar activities including any other function "after severance that changes the physical ... characteristics or enhances the marketability of the mineral." Wyo. Stat. Ann. § 39–14–101(a)(vii) (LexisNexis 2001).

[¶ 8] For coal sold away from the mouth of the mine pursuant to a bona fide arms-length sale, the statute mandates applying a formula to determine what portion of the sales value is attributable to the value of the gross product at the mouth of the mine, the point at which the product is valued for tax purposes under this constitutional and statutory scheme. This formula is a modification of the proportionate profit method of valuation utilized by the Internal Revenue Service (I.R.S.) in determining the value of the product mined for purposes of calculating depletion allowances under the Internal Revenue Code and corresponding regulations. "The objective of the *proportionate profits method* of computation is to ascertain gross income from mining by applying the principle that each dollar of the total costs paid or incurred to produce, sell, and transport the first marketable product ... earns the same percentage of profit." 26 C.F.R. § 1.613–4(d)(4) (2001). The federal formula multiplies the gross sales by the ratio of mining costs to total costs. Wyoming's formula differs slightly by using a ratio of *direct* mining costs to total *direct* costs. Section 39–14–103(b)(vii).

[¶ 9] Critical to this analysis, the statute specifies direct mining costs include

> mining labor including mine foremen and supervisory personnel whose primary responsibility is extraction of coal, supplies used for mining, mining equipment depreciation, fuel, power and other utilities used for mining, maintenance of mining equipment, coal transportation from the point of severance to the mouth of the mine, and any other direct costs incurred prior to the mouth of the mine that are specifically attributable to the mining operation[.]

Section 39–14–103(b)(vii)(B). Total direct costs are likewise defined to include a similar list of costs "attributable to the mining, processing or transportation of coal up to the point of loading for shipment to market." Section 39–14–103(b)(vii)(C). Indirect costs are differentiated from direct costs and allocated by the same ratio. Those costs are characterized as including, but are not limited to, "allocations of corporate overhead, data processing costs, accounting, legal and clerical costs, and other general and administrative costs which *cannot be specifically attributed to an operational function without allocation.*" Section 39–14–103(b)(vii)(D) (emphasis added).

[¶ 10] Also important to the taxpayer's argument in this case are the provisions establishing exemptions from taxation for "[p]roperty owned by the United States the majority of which is used primarily for a governmental purpose." Wyo. Stat. Ann. § 39–11–105(a)(i) (LexisNexis 2001). The statutory formula for determining the portion of the sales value considered the value of the gross product (the modified proportionate profits formula) deducts an exempt royalty defined by the Department's regulations as "royalty expense ... for interests owned by the United States, the State of Wyoming, or an Indian tribe." Department of Revenue Rules ch. 6, § 4(o) (Aug. 14, 2001).

## A. Is a Federal Lease Bonus Payment a Federal Royalty?

[¶ 11] Given this constitutional and statutory framework for the valuation of coal for taxation purposes, the taxpayer first argues the bonus payment should be amortized and deducted from the sales value because it constitutes a royalty payment for an interest owned by the United States. In support of its argument, the taxpayer suggests that the statutory term "royalty" should be interpreted to include all payments to the federal government for the privilege of mining because those payments are somehow federal property. The taxpayer argues such an interpretation would avoid the constitutional prohibition against taxation of property owned by the United States. Wyo. Const. art. 15, § 12.

[¶ 12] Although a royalty interest and the right to receive a bonus are both incidents of ownership of the mineral interest, they are not synonymous. The bonus is a payment to the federal government as consideration for the purchase of the coal lease. 43 C.F.R. § 3400.0–5(c) (2000). Whereas, a royalty reserved by the landowner is an interest in property that belongs to the owner of the reversionary interest in the mineral estate—in this case the federal government. 3 Am. L. of Mining § 85.02 (2d ed.1986). A review of the literature reveals a consistent differentiation between these terms and a recognition of their different meanings. The term royalty is used to describe a payment "reserved by the grantor of a . . . mining lease . . . and payable proportionately to the use made of such right," 3 Bouvier's Law Dictionary 2975 (8th ed.1914), and is "distinguished from other payments that are made pursuant to the provisions of the lease, such as bonus and delay rentals." Robert E. Sullivan, *All About Royalties,* 16 Rocky Mtn. Min. L. Inst. 227, 235 (1971). Royalties are also universally recognized as real property rights. *Id.* at 237. Bonuses, which are paid up front irrespective of production, "are not royalties in a technical sense" but are instead "a payment given to the lessor as consideration for executing the lease." 3 Am. L. of Mining, *supra* at § 85.03[4].

[¶ 13] This court has considered the different meanings of the terms mineral interest, royalty, bonus, and nonparticipating royalty interest. *Picard v. Richards,* 366 P.2d 119 (Wyo.1961). In *Picard,* Chief Justice Blume provided a detailed and thoughtful discussion of the use of those terms which clearly demonstrates each has a separate and distinct meaning and the interests conveyed depend on the terms employed. Specifically, the court recognized the term royalty was used to designate an interest carved out of the mineral estate and reserved to the owner of the mineral interest for permitting another to use the property and included the right to " 'receive, either in kind or its equivalent in money, a stipulated fraction of the oil and gas.' " 366 P.2d at 123 (quoting Hardwicke, *Royalty Clauses,* 29 Tex. L.Rev. 790). In contrast, the court recognized, "Bonus and delay rentals, or a portion thereof, go with

such [a mineral] estate, as shown by the foregoing cases." *Id.*

[¶ 14] The taxpayer argues that, simply because both federal lease bonuses and royalties on federal leases are payments to the federal government required to obtain the right to mine the federal coal, the legislature must have intended to include both payments when it chose to exempt royalties. This argument finds no support in persuasive authority and is inconsistent with the particular meaning with which those terms have been attributed over the course of mineral development. To bolster the argument, the taxpayer suggests that failure to interpret the statute in such a fashion risks creating an unconstitutional taxation of a federal property interest. Certainly, if federal royalties, which are reserved property interests of the federal government, were subject to tax, such a constitutional infirmity might exist. However, a bonus payment is not in and of itself a property interest but instead reflects the sale price for the sale of certain governmental property to a private entity. After execution of the lease, the only property remaining in federal ownership is the reserved royalty interest and the corresponding reversionary interest in the leased property that would come into play upon termination of the lease.

[¶ 15] The taxpayer further suggests the federal government's treatment of both bonuses and royalties as ordinary income for income tax purposes supports its position. Likewise, this argument does not survive scrutiny. Both types of payments may be income to the recipient. However, even the I.R.S. recognizes that all payments required by a governmental entity do not automatically constitute governmental property interests. In Revenue Ruling 85–16, the I.R.S. distinguished royalty payments from other governmental taxes and required payments and recognized royalty payments arise out of an economic interest in property in place. *Percentage Depletion; Gross Income from the Property in the Case of Minerals Other Than Oil and Gas,* 1985–1 C.B. 180, 1985–8 I.R.B. 7, Rev. Rul. 85–16, 1985 WL 286714 (IRS RRU Feb. 25, 1985).

[¶ 16] It is true the royalty and bonus are both compensation to the mineral owner for the value of the mineral produced. In general, they bear an inverse relationship to each other in terms of value. A mineral owner may accept a lower bonus in exchange for a higher royalty and vice versa. Keith J. Brewer et al., *Economic Approaches to Non-renewable Resource Taxation*, 11 J. of Nat. Resources & Envtl. L. 175 (1996). The federal government understood that relationship and determined that higher royalties might negatively affect certain federal policies. Therefore, it chose instead to obtain the fair market value of its coal by imposing the statutory minimum 12½ percent royalty and an appropriate minimum bonus to capture the remaining fair market value calculated using either comparable sales or a discounted cash flow analysis of the value of coal sales over the life of the mine. Simply because both a bonus and a royalty are intended to compensate the mineral owner does not mandate the conclusion they are identical types of interests. In the case of a bonus, the mineral owner demands a cash payment up front in order to sell its rights to produce the mineral. However, the same owner will likely retain a small interest free of the cost of production—a royalty—usually reflected as a percentage of the value of the produced mineral. *Picard*, 366 P.2d 119; 4 Am. L. of Mining § 131.06 (2d ed.1984). These well accepted concepts have been consistently applied, and we can find no persuasive authority for concluding a bonus is a royalty as a matter of law.

[¶ 17] In determining what meaning the legislature intended by the use of the term royalty, we apply our well established rules of statutory construction. *Bannon Energy Corporation*, 999 P.2d at 1308–09. We assume the legislature was well aware of the accepted legal definition and usage of the term royalty and cannot conclude it intended anything other than the well accepted meaning of the term royalty when it provided for federal royalties to be deducted as exempt royalties from the sales value of coal mined within this state. *Id.; see also Parker Land and Cattle Company v. Wyoming Game and Fish Commission*, 845 P.2d 1040, 1042 (Wyo.

1993); *Rasmussen v. Baker*, 7 Wyo. 117, 133, 50 P. 819, 823 (1897).

**B. Is a Bonus a Direct Mining Cost as Provided by Statute?**

[¶ 18] We find the logic of the taxpayer's second argument—that bonuses are indirect costs under the statutory definition—more persuasive. The proportionate profits method adopted by the legislature recognizes that indirect costs occur proportionately over all functions, production, processing, and transportation, in the same ratio as direct costs. Costs which "cannot be specifically attributed to an operational function without allocation" are considered indirect costs. Section 39–14–103(b)(vii)(D). To determine whether a bonus paid for the purchase of a coal lease is a direct mining cost or an indirect cost, we must again employ the rules of statutory construction in an attempt to glean the legislative intent.

[¶ 19] The legislature defined mining or production as "drilling, blasting, loading, roadwork, overburden removal, premouth of the mine reclamation, transportation from the point of severance to the mouth of the mine, and maintenance of facilities and equipment directly relating to any of the functions." Wyo. Stat. Ann. § 39–14–101(a)(v) (LexisNexis 2001). In the category of direct mining costs, the legislature specified mining labor including mine foremen and supervisory personnel whose primary responsibility is the extraction of coal, fuel power, mining equipment, and maintenance of mining equipment and then included the catch-all phrase "any other direct costs ... specifically attributable to the mining operation." Section 39–14–103(b)(vii)(B). Obviously, a bonus is not explicitly listed as a direct mining cost, and we must determine whether it falls into the catch-all phrase "any other direct costs ... specifically attributable to the mining operation." Such general words, following an enumeration of words with specific meanings, should be construed to apply to the same general kind or class as those specifically listed. *Reliance Insurance Company v. Chevron U.S.A. Inc.*, 713 P.2d 766, 770 (Wyo.1986); *Green River Development Company v. FMC Corporation*, 660

P.2d 339, 353 (Wyo.1983). Applying this doctrine of *ejusdem generis* requires the conclusion that the phrase direct mining costs was not intended to include such expenses as a bonus payment required for the purchase of the coal lease. Had the legislature intended to include costs not associated with the actual act of mining, we must presume it would have done so expressly and not by the use of a catch-all phrase that follows a very detailed list of costs incurred in the physical act of mining.

[¶ 20] This court considered the meaning of direct mining costs in *Wyodak Resources Development Corp. v. State Board of Equalization,* 9 P.3d 987 (Wyo.2000). There, a coal company was required to relocate a state highway in order to remove the coal from underneath the road. The expenses of that effort were consistent with the type of costs listed in the statute and were, therefore, determined to be properly classified as direct mining costs. Costs like federal bonus payments, which are necessary and beneficial to the entire operation, bear no resemblance to such hard mining costs as the excavation costs of moving a state highway.

[¶ 21] In addition to the difference in kind of a bonus payment from hard mining costs, bonus payments are not specifically attributed to an operational function without allocation. A similar result was reached in *General Portland Cement Co. v. United States,* 438 F.Supp. 27 (N.D.Tex.1977), *affirmed in part, reversed in part by General Portland Cement Co. v. United States,* 628 F.2d 321 (5th Cir.1980), when the court determined that, in applying the proportionate profit method, interest payments on loans not traceable to either mining or processing functions must be indirect costs. Not only is a bonus payment not traceable to the mining function of the operation, but the amount of the bonus is actually based upon the sales value of the coal after mining, processing, and transportation to the point of sale. To determine whether a bonus bid reflects the fair market value of the federal coal, the Secretary of the Interior uses either comparable sales or a discounted cash flow analysis, both of which rely upon the sales price of the coal measured at the point of sale. There-

fore, by its very nature, the bonus reflects the total value of the coal sold and not simply the value of the coal at the mouth of the mine, the point at which taxable value is determined. As such, a bonus can only be fairly allocated as an indirect cost to both the mining and the processing/transportation functions of the taxpayer's operation.

[¶ 22] The Department argues that, since the bonus is necessary to acquire a coal lease which allows the mining of coal, it is a direct cost of mining. This argument ignores the fact the coal lease authorizes not only the mining of coal but the construction and operation of processing and transportation facilities. The coal lease grants the right to "mine, extract, remove, *or otherwise process and dispose of the coal* ... together with the right to construct such works, buildings, plants, structures, equipment and appliances and the right to use such on lease rights-of-way which may be necessary and convenient in the exercise of the rights and privileges granted." (Emphasis added.) The Department's argument that, "but for" the coal lease being issued, no mining could take place ignores the fact that many undeniably indirect costs are necessary before mining can occur including the cost of mining permits, environmental impact statements, planning, and engineering. However, since the benefits of those costs cannot be allocated solely to either the mining or the processing function of the operation, they must be considered indirect. In *Amax Coal Company v. Wyoming State Board of Equalization,* 819 P.2d 825 (Wyo.1991), we found, under a different valuation method, reclamation costs attributable to the processing and transportation areas of the mine operation were not mining costs even though a mine could not have been built without commitment to those costs.

[¶ 23] The parties did not identify a method to allocate the bonus payment over all the operations. Given the character of the bonus payment and the statutory definition of the applicable terms, we conclude the legislature must have intended for a bonus payment to be treated as an indirect cost benefiting the entire operation.

[¶ 24]  Affirmed in part, reversed in part, and remanded.