2006 WY 137

**POWDER RIVER COAL COMPANY,**
Appellant (Petitioner),

v.

**WYOMING DEPARTMENT OF
REVENUE, Appellee
(Respondent).**

No. 05–296.

Supreme Court of Wyoming.

Oct. 31, 2006.

Representing Appellant: Lawrence J. Wolfe of Holland & Hart, LLP, Cheyenne, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General; Karl D. Anderson, Senior Assistant Attorney General; Ryan T. Schelhaas, Senior Assistant Attorney General. Argument by Mr. Schelhaas.

Before VOIGT, C.J., and GOLDEN, HILL *, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] Powder River Coal Company (PRCC)produces coal and sells it away from the mouth of each of its mines. Wyo. Stat. Ann. § 39–14–103(b)(vii) (LexisNexis 2005) requires the coal be valued for severance and ad valorem tax purposes using the proportionate profits method. In applying this method, costs must be categorized as either direct or indirect and PRCC contended employee healthcare costs were indirect costs. The Department of Revenue (DOR) disagreed, determined those costs should be treated as direct mining costs, and assessed PRCC accordingly for production years 1997–2000. Because the DOR treated healthcare costs as direct, rather than indirect, mining costs, PRCC's assessed value was higher because the ratio of direct costs to total costs was higher. PRCC appealed those assessments to the State Board of Equalization (SBOE). After a hearing, the SBOE affirmed the DOR's classification of employee healthcare costs as direct costs, and PRCC appealed that decision to the district court which certified the case to this Court pursuant to W.R.A.P. 12.09(b). We accepted the certification and, finding the SBOE properly interpreted the applicable statutes, we affirm.

## ISSUES

[¶ 2] PRCC presents the following issue:

Appellant operates a self-insurance program that pays healthcare costs for employees and dependents. In valuing Appellant's coal production, the Department of Revenue included these costs in direct labor costs which has the effect of assigning the costs by where employees work in the facility. The Appellant treated the healthcare costs as indirect costs. Did the State Board of Equalization err when it affirmed the Department's treatment as direct costs, when the holding is contrary to the State Board's factual finding that the costs do not follow employment?

The DOR re-phrases the issue as follows:

Did the State Board of Equalization properly conclude that Powder River Coal Company's employee healthcare costs were direct costs pursuant to the proportionate profits statute, Wyo. Stat. § 39–14–103(b)(vii)?

## FACTS

[¶ 3] PRCC is a subsidiary of Peabody Investments Corporation (Peabody) and owns three coal mines in Campbell County, Wyoming. Peabody offers a healthcare plan to all of its employees funded by the company through a program of self-insurance. Employees pay a monthly fee of $25 for an individual participant, $50 for an employee plus one dependent, and $75 for a family and receive coverage for medical, dental, vision and prescription drug expenses. Employees who choose not to participate in the plan are paid $1,200 annually. While this plan is funded by the company, it is administered through a third party administrator under a service contract. PRCC pays a monthly fee per employee to the administrator and, in return, the administrator processes and adjudicates the claims and pays the providers.

* Chief Justice at time of oral argument.

The healthcare plan is similar to traditional insurance coverage in that it has enrollment requirements, limitations for pre-existing conditions, employee co-pays, participating provider requirements, coverage exclusions, pre-certification of coverage and provider payment limitations based upon "usual and reasonable customary charges." Healthcare providers submit their bills for reimbursement directly to the administrator rather than to PRCC. The administrator reviews all claims, determines eligibility, pays eligible claims and sends Peabody a weekly summary of the claims paid. Peabody then pays the administrator to cover those payments. No accruals or reserves exist to cover healthcare costs; the claims are simply paid as incurred. Monthly reports are provided to Peabody identifying the claims made by each individual employee by social security number. This information allows Peabody to attribute healthcare costs back to individual employees at a particular mine. However, in the interest of employee confidentiality, this information is not shared with the mine management. Instead, the mines are provided with the total healthcare costs for each facility.

[¶ 4] PRCC has a sophisticated accounting system allowing it to attribute its salary costs to the separate functions of mining, transportation and processing. Employees use time cards to record where they worked in the mine. PRCC then enters that information into its accounting system and tracks its labor costs by functional category. From 1990, when the proportionate profits method was adopted by the legislature, to 1997, PRCC treated healthcare costs as direct costs and attributed those costs to the three operational functions, mining, transportation and processing. Although its accounting system did not capture healthcare costs by operational category, PRCC used the salary percentages for each function to determine the percentage of healthcare costs for that particular function. The DOR agreed with and accepted PRCC's method of attributing its healthcare costs to the various mine functions.

[¶ 5] In the course of the audit of PRCC's tax returns for the years 1997–2000, the company took the position that healthcare costs should no longer be treated as direct costs.

The explanation given by Jeff Maher, Assistant Controller of Operations for Peabody, who was responsible for the tax returns, was that healthcare costs were indirect because they did not track directly with employee wages, and PRCC could not attribute healthcare costs to a particular function where the employee worked. Don Coovert, a PRCC consultant who assisted with preparation of the tax returns, provided a further reason for treatment of healthcare costs as indirect. He explained his understanding of the legislative history of the statutes establishing the proportionate profit method and concluded that healthcare costs fit the statutory definition of indirect costs because they are not specifically listed as a direct cost in the statute and could not be attributed to an operation function without allocation.

[¶ 6] PRCC agrees its healthcare benefits are part of its compensation package and are a substantial inducement to potential employees. It also recognizes that good healthcare benefits are one of the things the company offers to discourage unionization.

**STANDARD OF REVIEW**

[¶ 7] When we review cases certified to this Court pursuant to W.R.A.P. 12.09(b), we apply the appellate standards applicable to the court of the first instance. *State ex rel. Wyo. Dep't of Revenue v. Buggy Bath Unlimited, Inc.*, 2001 WY 27, ¶ 5, 18 P.3d 1182, 1185 (Wyo.2001); *see also Union Tel. Co. v. Wyo. Pub. Serv. Comm'n*, 907 P.2d 340, 341–42 (Wyo.1995). Wyo. Stat. Ann. § 16–3–114 (LexisNexis 2005) governs judicial review of administrative decisions. *Buggy Bath Unlimited, Inc.*, ¶ 5, 18 P.3d at 1185; *Everheart v. S & L Indust.*, 957 P.2d 847, 851 (Wyo.1998).

[¶ 8] When an appealing party contests an agency's findings of fact, we examine the entire record to determine if the agency's findings are supported by substantial evidence. *RT Commc'ns, Inc. v. State Bd. of Equalization*, 11 P.3d 915, 920 (Wyo. 2000). If the agency's findings of fact are supported by substantial evidence, we will not substitute our judgment for that of the agency and will uphold the factual findings

on appeal. *Id.* at 921. "Substantial evidence is more than a scintilla of evidence; it is evidence that a reasonable mind might accept in support of the conclusions of the agency." *Id.*

[¶ 9] We review an agency's conclusions of law *de novo. Wyo. Dep't of Revenue v. Guthrie,* 2005 WY 79, ¶ 13, 115 P.3d 1086, 1091 (Wyo.2005). If a conclusion of law is in accord with the law, it is affirmed. *Airtouch Commc'ns, Inc. v. Dep't of Revenue,* 2003 WY 114, ¶ 10, 76 P.3d 342, 347. "However, when the agency has failed to properly invoke and apply the correct rule of law, we correct the agency's error." Id. This case requires interpretation of the relevant tax statutes. Statutory interpretation is a question of law. *Powder River Coal Co. v. Wyo. State Bd. of Equalization,* 2002 WY 5, ¶ 6, 38 P.3d 423, 426 (Wyo.2002); *Chevron U.S.A., Inc. v. State,* 918 P.2d 980, 983 (Wyo. 1996).

## DISCUSSION

[¶ 10] We discussed the proportionate profits method and its statutory and constitutional underpinnings in *Powder River,* as follows:

The genesis of this dispute lies in the constitutional and statutory construct for the taxation of minerals in Wyoming. The Wyoming Constitution provides that all mines "shall be taxed ... in lieu of taxes on the lands[ ] on the gross product thereof ...; provided, that the product of all mines shall be taxed in proportion to the value thereof." Wyo. Const. art. 15, § 3. The statutes then impose ad valorem and severance taxes upon the value of the gross product mined. Wyo. Stat. Ann. §§ 39–13–103, 39–14–103 (LexisNexis 2001). "The value of the gross product shall be the fair market value of the product at the mouth of the mine where produced, after the mining or production process is completed." Section 39–14–103(b)(ii).

For coal sold away from the mouth of the mine pursuant to a bona fide arms-length sale, the statute mandates applying a formula to determine what portion of the sales value is attributable to the value of the gross product at the mouth of the mine, the point at which the product is valued for tax purposes under this constitutional and statutory scheme. This formula is a modification of the proportionate profit method of valuation utilized by the Internal Revenue Service (I.R.S.) in determining the value of the product mined for purposes of calculating depletion allowances under the Internal Revenue Code and corresponding regulations. "The objective of the *proportionate profits method* of computation is to ascertain gross income from mining by applying the principle that each dollar of the total costs paid or incurred to produce, sell, and transport the first marketable product ... earns the same percentage of profit." 26 C.F.R. § 1.613–4(d)(4) (2001). The federal formula multiplies the gross sales by the ratio of mining costs to total costs. Wyoming's formula differs slightly by using a ratio of *direct* mining costs to total *direct* costs. Section 39–14–103(b)(vii).

Critical to this analysis, the statute specifies **direct mining costs include**

**mining labor** including mine foremen and supervisory personnel whose primary responsibility is extraction of coal, supplies used for mining, mining equipment depreciation, fuel, power and other utilities used for mining, maintenance of mining equipment, coal transportation from the point of severance to the mouth of the mine, **and any other direct costs incurred prior to the mouth of the mine that are specifically attributable to the mining operation[.]**

Section 39–14–103(b)(vii)(B). Total direct costs are likewise defined to include a similar list of costs "attributable to the mining, processing or transportation of coal up to the point of loading for shipment to market." Section 39–14–103(b)(vii)(C). **Indirect costs are differentiated from direct costs and allocated by the same ratio. Those costs are characterized as including, but are not limited to, "allocations of corporate overhead, data processing costs, accounting, legal and clerical costs, and other general and administrative costs which cannot be specifically**

attributed to an operational function without allocation." Section 39–14–103(b)(vii)(D).

*Powder River,* ¶¶ 7–9, 38 P.3d at 426–27 (emphasis added).

[¶ 11] The fundamental question we must answer in this case is what the legislature intended by the phrase "direct mining costs include mining labor" as it is used in § 39–14–103(b)(vii)(B). Our rules of statutory construction have been oft-cited and focus on the plain language chosen by the legislature.

We first decide whether the statute is clear or ambiguous. This Court makes that determination as a matter of law. A "statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability." *Allied–Signal, Inc. v. Wyo. State Bd. of Equalization,* 813 P.2d 214, 220 [ (Wyo.1991) ]. A "statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations." 813 P.2d at 219–20.

If we determine that a statute is clear and unambiguous, we give effect to the plain language of the statute.

We begin by making an " 'inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection.' " *Parker Land and Cattle Company v. Wyoming Game and Fish Commission,* 845 P.2d 1040, 1042 (Wyo.1993) (quoting *Rasmussen v. Baker,* 7 Wyo. 117, 133, 50 P. 819, 823 (1897)). We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe together all parts of the statute in *pari materia.* *State Department of Revenue and Taxation v. Pacificorp,* 872 P.2d 1163, 1166 (Wyo.1994). If we determine that the statute is ambiguous, we resort to general principles of statutory construction to determine the legislature's intent.

*State v. Bannon Energy Corporation,* 999 P.2d 1306, 1308–09 (Wyo.2000) (some citations omitted).

*Powder River,* ¶ 6, 38 P.3d at 426.

[¶ 12] While we can assume the legislature believed it was putting to rest all of the debate concerning mineral valuation when it completely revamped the mineral taxation statutes in 1990, the industry, the responsible agencies, and the courts continue to be faced with a seemingly never-ending series of scenarios calling into question what the legislature intended with regard to the categorization of costs in the context of the proportionate profits method of valuation. Given our charge is to discern legislative intent, we must glean what we can from the sometimes meager statutory language.

[¶ 13] Both PRCC and the DOR agree the statutory language is unambiguous. It provides that to determine the fair market value of coal sold away from the mouth of the mine, the sales value of extracted coal, minus royalties and taxes, must be multiplied by the ratio of direct mining costs to total direct costs. Section 39–14–103; *Powder River,* ¶¶ 7–9, 38 P.3d at 426–27. To determine whether a particular cost is a "direct mining cost," we look first to the statutory list of such costs. First on that list, we find "mining labor including plant foremen and supervisory personnel whose primary responsibility is extraction of coal." Section 39–14–103(b)(vii)(B). PRCC contends the word "labor" means only salary and wages and, if the legislature had intended it to include employee healthcare costs, it would have said so. Predictably, the DOR argues just the opposite—the plain meaning of labor includes healthcare costs and had the legislature intended to exclude those costs, it could have done so.

[¶ 14] The plain meaning of "labor" in the context of this statute is the work necessary to accomplish the act of mining. The statute defines mining or production as "drilling, blasting, loading, roadwork, overburden removal, pre-mouth of the mine reclamation, transportation from the point of severance to the mouth of the mine, and maintenance of facilities and equipment directly relating to any of the functions stated in this paragraph." Wyo. Stat. Ann. § 39–14–101(a)(v) (LexisNexis 2005). Thus, whatever it costs the employer to obtain the necessary work to accomplish the mining is

the cost of labor. Everyone would agree wages are a component of the direct cost of labor. Black's Law Dictionary 1579 (6th ed.1990) (citations omitted) defines wages as follows:

> **Wages.** The compensation given to a hired person for his or her services. Compensation of employees based on time worked or output of production.
>
> Every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, dismissal wages, bonuses and reasonable value of board, rent, housing, lodging, payments in kind, tips, and any other similar advantage received from the individual's employer or directly with respect to work for him. Term should be broadly defined and includes not only periodic monetary earnings but all compensation for services rendered without regard to manner in which such compensation is computed.

[¶ 15] It cannot be seriously disputed that healthcare benefits are offered to employees to induce them into employment and are looked upon by both employer and employee as part of the compensation package for the work performed. In fact, in our society today, with the pressure felt by all from ever increasing healthcare costs, we can fairly conclude healthcare is a very important component of compensation for the employee and a very costly expense to the employer. A careful reading of the testimony of PRCC's witnesses demonstrates, as an employer, it does not dispute the fact that healthcare benefits are part of the cost of mining labor. However, PRCC concludes healthcare costs are not a "direct" cost. PRCC provides two reasons for that conclusion.

[¶ 16] First, PRCC claims the term "mining labor" within the list of "direct mining costs" is a term of art in the field of accounting and means "direct labor" which includes only wages and not fringe benefits. Technical terms or "terms of art" are given their technical meaning unless the legislature expresses a different intent. *Williams Prod.*

*RMT Co. v. State Dep't of Revenue,* 2005 WY 28, ¶ 19, 107 P.3d 179, 185–86 (Wyo.2005); *Amoco Prod. Co. v. State,* 751 P.2d 379, 382 (Wyo.1988). Whether a term has such a technical meaning is a question of fact to be proved. 2A N. Singer Sutherland, *Statutory Construction,* § 48:16 (6th ed 2000). Mr. Coovert, an accountant with extensive experience in mineral taxation, testifying on behalf of PRCC, opined it was well known and understood in the cost accounting field that "direct labor" excludes fringe benefits like healthcare. However, he conceded there are accounting authorities who would differ with his opinion of the definition of "direct labor." The DOR cites Rebecca A. Gallun, et al., *Fundamentals of Oil and Gas Accounting,* 266 (4th ed.2001); Charlotte J. Wright, et al., *International Petroleum Accounting,* 229 (2005); and the Internal Revenue Service,[1] for the opposite proposition, i.e. direct labor costs include fringe benefits. In addition, the DOR cites to various court opinions which came to the same conclusion in different contexts, including *Frisco Employee's Hosp. Ass'n v. State Tax Comm'n of Mo.,* 381 S.W.2d 772, 776 (Mo.1964); *Publ'ers Paper Co. v. Dep't of Revenue,* 270 Or. 737, 530 P.2d 88, 98 (1974); *Teradyne, Inc. v. Teledyne Indus., Inc.,* 676 F.2d 865, 870 (1st Cir.1982); *Hyster Co. v. United States,* 848 F.Supp. 178, 189 (Ct. Int'l Trade 1994); *Cent. Ill. Light Co. v. Stenzel,* 44 Ill.App.2d 388, 195 N.E.2d 207, 213 (1964).

[¶ 17] In its factual findings, the SBOE found "mining labor" in the context of the statute was not a term of art and did not mean only "actual hourly wage or salary paid and nothing else," as contended by PRCC. In part, it relied upon the fact that the authorities disagreed upon a technical meaning and PRCC offered only the personal opinion of its expert. We conclude the record contains substantial evidence to support the SBOE's factual finding.

We agree with the SBOE that:

> There is no dispute that healthcare costs are part of the total compensation paid to mine employees. *Findings,* ¶ 19. At the

---

**1.** *IRS, Market Segment Specialization Program Guideline,* Oil and Gas Industry, p. 44, 1996 WL 672892 (I.R.S. May 1996) and *Internal Revenue*

*Service General Counsel Memorandum,* p. 4, 1971 WL 28848.

simplest level, it makes more common sense to view "mining labor" as embracing employee healthcare costs in the manner urged by the Department. The words are certainly broad enough for this purpose. Also, as the Department points out, the legislature could have excluded fringe benefits by using more limited language such as "mining wages and salaries," but did not do so.

[¶ 18] PRCC also contends that even if healthcare costs can be considered part of "labor," they must be indirect costs because they do not correlate directly with wages and, therefore, cannot be "attributed" to mining as required by the statute. It points to SBOE findings 60 and 91 recognizing these costs do not vary in proportion to wages, but instead depend upon marital status, number of dependents, age, general health, etc. and are not related to whether an employee works in mining, processing or transportation. PRCC maintains these findings and conclusions must lead to the conclusion that these costs are indirect. Unless labor costs can be "attributed" to mining, PRCC contends, they cannot qualify as direct mining costs. That contention raises the question of what the legislature meant by providing in § 39–14–103(b)(vii)(B) that direct mining costs must be "specifically attributable to the mining operation" as opposed to § 39–14–103(b)(vii)(D) which defines indirect costs as those that "cannot be specifically attributed to an operational function without allocation." PRCC suggested, through the testimony of Mr. Coovert, that "attribute" means actually tracked by the taxpayer's accounting system as part of mining costs whereas "allocate" connotes a division of costs by percentage or some other appropriate method. The SBOE rejected PRCC's interpretation of "attribute" because it necessarily depended on the accuracy and detail of an individual taxpayer's accounting system and could result in disparate and unequal treatment among taxpayers in the same industry. We agree with that conclusion. However, we do not agree that the legisla-

ture intended there to be no difference between "attribute" and "allocate." In interpreting statutes, we give meaning to each word and phrase. *Powder River,* ¶ 6, 38 P.3d at 426; *State Dep't of Revenue and Taxation v. Pacificorp,* 872 P.2d 1163, 1166 (Wyo.1994). Giving meaning to each word and reading all of these statutory provisions together, it appears the legislature intended costs directly associated with mining, as opposed to other operational functions, to be "attributable" to mining and, therefore, "direct mining costs." However, if costs were necessary to the whole operation, but only indirectly associated with each individual operational function, a portion of those costs could only be considered mining costs by allocation via the direct cost ratio.

[¶ 19] PRCC seems to suggest that the definition of indirect costs, which refers to costs "which cannot be attributed to an operational function without allocation" means if *any* method of allocation is used to attribute the cost to mining, then the cost must be indirect. This interpretation ignores legislative intent exhibited by the list of specific indirect costs. That list suggests that indirect costs, such as corporate overhead, legal, secretarial, etc., are those costs that by their nature are not directly associated with any particular operational function. That is what makes them "indirect" and they must then be allocated to mining by the direct cost ratio. PRCC's expert, Mr. Coovert, contended that, if costs had to be spread over all of the functions by some formula and not by direct attribution by an accounting system, they were indirect costs. The SBOE disagreed with his approach, and so do we because it ignored the fact that many costs which everyone would agree were direct costs, such as warehousing, but which benefit more than one mining function, e.g. mining, processing and transportation, would somehow morph into indirect costs because of the use of a formula to attribute those costs to the mining function.[2] Mr. Coovert addressed

---

**2.** Mr. Coovert confirmed that as many as fifty to one hundred other methods of allocating direct costs have been used by other mining companies and approved by the DOR to attribute indisput-

ably direct costs to the mining function. While we recognize the administrative confusion that approach might generate, it seems inherent in the direct cost ratio chosen by the legislature as

this anomaly by suggesting that, because specifically listed direct costs *had* to be treated as direct costs, if necessary, those costs could be allocated by some formula, but any costs falling into the "catchall" phrase of "any other direct costs" could not be so allocated. If they had to be allocated because of their nature and the particular taxpayer's accounting system, then they became indirect costs. We are not convinced the legislature intended the value of coal to depend upon the individual taxpayer's accounting system.

[¶ 20]  However, even if PRCC's interpretation of the statutes were correct, the evidence established PRCC's accounting system did, in fact, allow healthcare costs to be attributed to each employee by social security number and, thus, those costs could be attributed to the relative function or functions performed by the employee. Recognizing this approach may result in aberrations from year to year when individual employees incur extraordinary medical expenses, PRCC, with the DOR's agreement, had historically distributed those costs evenly over all of the mine functions in the same percentage as the salary and wages costs were distributed. The DOR has also allowed other taxpayers to distribute those costs on a per capita basis.

[¶ 21]  We conclude, when all the provisions of the statute are read together, the legislature simply meant all costs, a portion of which are directly associated with a particular function, should be attributed to that function in some reasonable way. The indirect cost catch-all phrase in subsection 39–14–103(b)(vii)(D), "other general and administrative costs which cannot be specifically attributed to an operational function without allocation," simply means costs similar to those specifically listed which are not directly related to a function and, therefore, must be allocated by the direct cost formula. The words "without allocation" in that section were not intended to prevent costs directly associated with a particular function from being considered as direct costs simply because they had to be allocated among the

functions by some agreed upon formula, either because of the level of detail provided by the taxpayer's accounting system or because of the nature of the cost. The more reasonable interpretation of that language suggests the catch-all phrase means other costs similar in nature to the listed indirect costs and for which no reasonable formula exists to allocate those costs among functions except the direct cost ratio.

[¶ 22]  This interpretation is consistent with this Court's jurisprudence and the SBOE's prior treatment of indirect costs pursuant to this statute. That issue has been addressed in four cases: *In the Matter of the Appeal of Exxon Coal U.S.A., Inc.,* SBOE Doc. No. 93–107 (Wy.St.Bd.Eq. Oct. 6, 1994); *In the Matter of the Appeal of Marigold Land Co.,* SBOE Doc. No.2001–106 (Wy.St. Bd.Eq., Aug. 8, 2002); *Powder River,* 38 P.3d 423; and *Wyodak Res. Dev. Corp. v. State Bd. of Equalization,* 9 P.3d 987 (Wyo.2000). In *Exxon Coal,* the SBOE concluded final reclamation costs accruals were not direct costs of mining. Finding those costs estimated future costs and no basis existed to charge them to a "distinct portion of the mine operations," the Board concluded they were indirect costs and could only be attributed to mining by allocation through the direct cost ratio. PRCC's healthcare costs are actual costs rather than estimates of future costs and individual employee healthcare costs can be attributed to the employee's operational function or distributed as they have been in the past by using the wage percentages.

[¶ 23]  This Court, in *Powder River,* concluded coal lease bonus payments were indirect costs because they were both unlike the specifically listed "hard mining costs" in § 39–14–103(b)(vii)(B) and necessary and beneficial to the entire operation and not just the mining function. *Powder River,* ¶ 20, 38 P.3d at 430. Applying that precedent in *Marigold,* the Board concluded mine development costs incurred before construction of the mine were indirect costs because those costs could not be tied to a particular operational function without allocation and the tax-

the method to value coal sold away from the mine because the legislature could not list every

conceivable direct cost and did not mandate the type of accounting system a taxpayer must use.

payer's choice of allocation methods was arbitrary. *Marigold*, Docket No. 2001–106, ¶¶ 83–87. Healthcare costs, unlike coal lease bonuses or mine development costs, can be, and have been, tied to the function in which the individual employee responsible for those costs worked.

[¶ 24] In contrast, the SBOE and this Court have found costs to be direct mining costs when those costs were directly associated with the act of mining. In *Wyodak*, the mining company had to move a state highway in order to mine the coal beneath it. We affirmed the SBOE and said the costs of doing so were "... direct costs because they were or will be incurred as a condition of mining the specific coal under and around the right-of-way. Wyodak moved the highway so that it could mine the coal." *Wyodak*, 9 P.3d at 991. The same can be said of healthcare costs for mining workers. Those workers must be "compensated" in order to mine the coal. As we stated above, healthcare benefits are considered by all to be a valuable piece of the compensation package.

 [¶ 25] As additional support for its position, PRCC argues the DOR has been inconsistent in its treatment of healthcare costs for other taxpayers. It points to an exchange of letters between DOR employee, Mr. Grenvik, and another mining company. While it is true those letters could be read to indicate the DOR agreed with the position taken by PRCC with regard to the treatment of healthcare costs as indirect costs, the SBOE gave them little weight concluding the context in which they were written, e.g. negotiations with another taxpayer about which portion of their healthcare benefits should be included as direct costs, explained the apparent inconsistency. The SBOE's explanation is reasonable and supported by substantial evidence. However, in addition, this tempest in a teapot is of little persuasive value since PRCC concedes it had historically reported healthcare benefits as direct costs, and so had much of the rest of the industry, because the DOR had instructed them to do so. That undisputed fact indicates the DOR has taken a consistent position based upon its interpretation of the statute. Inconsistency in how other taxpayers may have treated these costs in individual tax returns does not control how the statute should ultimately be interpreted.

## CONCLUSION

[¶ 26] The proportionate profit method of calculating the value of coal for purposes of severance and ad valorem taxation provided by the statutes unavoidably lends itself to debate over whether individual items of cost are direct or indirect costs of mining. On the basis of the language of the statute, our precedent interpreting that language, and our understanding of the intent of the legislature, we hold that healthcare benefits offered as part of an employee's compensation package are part of the direct cost of mining labor pursuant to § 39–14–103(b)(vii)(B). The SBOE's findings of fact, conclusions of law and order are affirmed.