2003 WY 114

**AIRTOUCH COMMUNICATIONS, INC.; Wyoming RSA #3 (Cellular Inc., Network Corp.) Wyoming RSA #2 (Sheridan Limited Partnership); and Wyoming RSA #1 (Park Limited Partnership), Appellants (Petitioners),**

v.

**DEPARTMENT OF REVENUE, STATE OF WYOMING, Appellee (Respondent).**

No. 02–129.

Supreme Court of Wyoming.

Sept. 12, 2003.

Representing Appellants: Richard G. Smith of Hawley Troxell Ennis & Hawley LLP, Boise, Idaho; and W. Perry Dray and Gregory C. Dyekman of Dray, Thomson & Dyekman, P.C., Cheyenne, Wyoming.

Representing Appellee: Hoke MacMillan, Attorney General; John W. Renneisen, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General; and Cathleen D. Parker, Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] Four cellular companies appealed from the Department of Revenue's (DOR) 1999 and 2000 valuations of their property contending they were not subject to state assessment as "telephone companies" and, in the alternative, the valuations were improper because the value of intangible property, exempt from taxation by statute, was not deducted. The State Board of Equalization (SBOE) affirmed the valuations finding cellular companies are "telephone companies" within the meaning of the statute and the companies failed to carry their burden of proving the value of their intangible property. We agree the companies are "telephone companies" under the statute. With respect to the valuation, we affirm in part, reverse in part, and remand for further consideration consistent with this opinion.

### ISSUES

[¶ 2] The appellants present the following issues:

I.  Did the state board err in concluding that each appellant constitutes a "telephone company" subject to state assessment pursuant to W.S. § 39–13–102(m)(vi)?

II.  Did the board err in adopting erroneous criteria for the exclusion of intangible property, exempt under W.S. § 39–11–105(xxix) and § 39–111–101(a)(vii), and in its improper interpretation of the standards for exclusion of intangible property set forth in *RT Communications v. Board of Equalization*, 2000 WY 183, 11 P.3d 915?

III.  Did the board err in affirming the value of the tangible assets subject to valuation through the cost approach used by the department, and in affirming the "economic enhancement" adjustment utilized by the department to artificially and improperly increase the value of that tangible property?

IV.  Did the board err in refusing to allow an increase in the capitalization rate to reflect the "flotation" cost adjustment granted by the department to other taxpayers and to these taxpayers in an amended valuation?

V.  Did the board err in excluding from evidence an independent, comprehensive valuation of taxpayers' taxable and exempt property, both as an operating business enterprise and the individual components thereof, while at the same time concluding that taxpayers did not provide sufficient information for the department to identify and remove the value associated with exempt intangible assets?

VI.  Ultimately, did the board err in affirming the unitary or business enterprise value for the taxpayers, as determined by the Department of Revenue, and by failing to exclude the value of separable and identifiable intangible assets exempt under W.S. § 39–11–101(a)(vii)?

DOR frames the issues in the following manner:

1.  Did the state board correctly hold that the taxpayers were telephone companies subject to state assessment under Wyo. Stat. 39–13–102(m)(vi)?

2.  Did the state board correctly conclude that the intangibles identified by the taxpayers did not have to be removed from the valuation completed by the department?

3.  Did the state board properly conclude that the economic enhancement adjustment was appropriate in order to measure the true value of the taxpayers' property?

4.  Did the state board properly conclude that the issue of flotation costs was not properly before the state board?

5.  Did the state board properly exclude evidence supplied to the department over a year after the initial valuation was completed?

6.  Does the state board ruling result in uniform assessment?

### FACTS

[¶ 3] The Ad Valorem Division of DOR certifies the values of approximately sixty telephone companies to the county assessors

on an annual basis. As provided by statute, all state assessed taxpayers are required to report the value of their property to DOR to facilitate the valuation and assessment process. DOR valued and assessed the cellular service providers pursuant to Wyo. Stat. Ann. § 39–13–102 (LexisNexis 2001), using a unitary approach to valuation which values all the assets of a "going concern" as opposed to the summation method which values individual assets and then sums the total. Four of the cellular companies objected to their 1999 and 2000 valuations. Those companies, the appellants in this case, were Airtouch Communications, Inc., which serves eastern and southeast Wyoming; Wyoming RSA # 3 (Cellular Inc., Network Corp.) which serves southwest Wyoming; Wyoming RSA # 2 (Sheridan Limited Partnership) serving the Sheridan area; and Wyoming RSA # 1 (Park Limited Partnership) serving the Cody area (collectively referred to hereafter as "taxpayers").

[¶ 4] After the issuance of the 1999 preliminary valuations, the taxpayers (exclusive of Airtouch) requested an informal conference with DOR appraisers to urge deduction of the value of intangible property. The taxpayers made this request despite the fact that they provided no information concerning those values either in the 1999 annual reports filed with DOR or during the informal conference. After the informal discussion and the taxpayers' submittal of limited additional information relating to equipment obsolescence, DOR issued revised final 1999 valuations which reduced the preliminary appraisals by ten percent to account for equipment obsolescence. The taxpayers (exclusive of Airtouch) appealed from the final 1999 valuations.

[¶ 5] In 2000, the taxpayers did not request an informal conference after receiving the preliminary valuations, and they did not provide DOR with information on the value of claimed exempt intangible property. The taxpayers (including Airtouch) appealed from the final 2000 valuations. The values as determined by DOR were as follows:

| Taxpayer | 1999 Fair Market Value | 2000 Fair Market Value |
| --- | --- | --- |
| Wyoming RSA # 1 | $ 4,580,000 | $ 4,569,000 |
| Wyoming RSA # 2 | $ 3,119,000 | $ 6,254,000 |
| Wyoming RSA # 3 | $18,632,868 | $23,438,896 |
| Airtouch | n/a | $30,131,000 |

[¶ 6] The 1999 appeals were consolidated by SBOE on its own motion in March of 2000 without objection by the parties, and the hearing was originally scheduled for November 8, 2000. SBOE rescheduled the contested case hearing to June 25, 2001. Both parties then requested a continuance which SBOE granted, and the hearing was again rescheduled for October 8, 2001.

[¶ 7] In May 2001, over a year after the values were certified to the counties, the taxpayers provided independent appraisals performed by the accounting firm of Ernst and Young [EY] to DOR to support their arguments that the value of exempt intangible property was inappropriately used to enhance their taxable property valuations. At the hearing, SBOE refused to admit the EY appraisals to the extent the information contained therein was not available to DOR at the time of the assessment, finding SBOE's role at the contested case hearing was not to set value but instead was limited to determining whether DOR's methodology to value the taxpayers' property was supported by substantial evidence. The taxpayers' evidence established the following taxable values for their property:

| Taxpayer | 1999 | 2000 |
| --- | --- | --- |
| Wyoming RSA # 1 | $ 3,345,271 | $ 3,661,130 |
| Wyoming RSA # 2 | $ 2,852,941 | $ 3,492,824 |
| Wyoming RSA # 3 | $15,654,412 | $17,116,279 |
| Airtouch | n/a | $20,458,472 |

[¶ 8] SBOE affirmed DOR's assessment and valuation of the taxpayers' property as telephone companies subject to § 39–13–102. The taxpayers appealed, and the district court certified the case to this Court pursuant to W.R.A.P. 12.09(b).

## STANDARD OF REVIEW

[¶ 9] When we review cases certified pursuant to W.R.A.P. 12.09(b), we apply the appellate standards which are applicable to the court of the first instance. Judicial review of administrative decisions is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2001).[1] *Powder River Coal Company v. Wyoming State Board of Equalization,* 2002 WY 5, ¶ 5, 38 P.3d 423, ¶ 5 (Wyo.2002). The threshold issue we must consider is whether the taxpayers were treated correctly by DOR as telephone companies pursuant to § 39–13–102(m)(vi). This is a question of statutory interpretation and hence one of law which we review *de novo. Id.* at ¶ 6. Similarly, the question of whether SBOE properly applied the statutory exemption for intangible property consistently with this Court's decision in *RT Communications, Inc. v. State Board of Equalization for State of Wyoming,* 11 P.3d 915 (Wyo.2000), is also a question of law to be reviewed *de novo.*

[¶ 10] We affirm an agency's conclusions of law when they are in accordance with the law. *Powder River Coal Company,* 2002 WY 5, ¶ 6, 38 P.3d 423. However, when the agency has failed to properly invoke and apply the correct rule of law, we correct the agency's error. *Id.* The rules of statutory interpretation also apply to the interpretation of administrative rules and regulations. *Id.*

These rules are often cited and are well recognized:

We first decide whether the statute is clear or ambiguous. This Court makes that determination as a matter of law. A "statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistency and predictability." *Allied–Signal, Inc.* [*v. Wyoming State Board of Equalization* ], 813 P.2d [214,] 220 [ (Wyo.1991) ]. A "statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations." 813 P.2d at 219–20.

If we determine that a statute is clear and unambiguous, we give effect to the plain language of the statute.

We begin by making an " 'inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection.' " *Parker Land and Cattle Company v. Wyoming Game and Fish Commission,* 845 P.2d 1040, 1042 (Wyo.1993) (quoting *Rasmussen v. Baker,* 7 Wyo. 117, 133, 50 P. 819, 823 (1897)). We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe together all parts of the statute *in pari materia.*

State Department of Revenue and Taxation v. Pacificorp, 872 P.2d 1163, 1166 (Wyo.1994). If we determine that the statute is ambiguous, we resort to general principles of statutory construction to determine the legislature's intent.

*State v. Bannon Energy Corporation,* 999 P.2d 1306, 1308–09 (Wyo.2000) (some citations omitted); *see also Wyodak Resources Development Corporation v. Wyoming Department of Revenue,* 2002 WY 181, ¶ 9, 60 P.3d 129, ¶ 9 (Wyo.2002).

---

1. Section 16–3–114(c) provides:
    (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
    (i) Compel agency action unlawfully withheld or unreasonably delayed; and
    (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
    (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
    (B) Contrary to constitutional right, power, privilege or immunity;
    (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
    (D) Without observance of procedure required by law; or
    (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 11] With regard to factual questions, this Court has clarified that "the substantial evidence test is the appropriate standard of review in appeals from WAPA contested case proceedings when factual findings are involved and both parties submit evidence." *Newman v. State ex rel. Wyoming Workers' Safety and Compensation Division,* 2002 WY 91, ¶ 22, 49 P.3d 163, ¶ 22 (Wyo.2002). In matters where evidence is presented by only one party or procedural rulings are made, we review the entire record to determine whether the action was arbitrary or capricious. *Id.*

[¶ 12] With regard specifically to valuations of property by DOR for purposes of taxation, we have recently noted:

The Department's valuations for state-assessed property are presumed valid, accurate, and correct. This presumption can only be overcome by credible evidence to the contrary. In the absence of evidence to the contrary, we presume that the officials charged with establishing value exercised honest judgment in accordance with the applicable rules, regulations, and other directives that have passed public scrutiny, either through legislative enactment or agency rule-making, or both.

The petitioner has the initial burden to present sufficient credible evidence to overcome the presumption, and a mere difference of opinion as to value is not sufficient. If the petitioner successfully overcomes the presumption, then the Board is required to equally weigh the evidence of all parties and measure it against the appropriate burden of proof. Once the presumption is successfully overcome, the burden of going forward shifts to the DOR to defend its valuation. The petitioner, however, by challenging the valuation, bears the ultimate burden of persuasion to prove by a preponderance of the evidence that the valuation was not derived in accordance with the required constitutional and statutory requirements for valuing state-assessed property.

Moreover, in examining the propriety of the valuation method, our task is not to determine which of the various appraisal methods is best or most accurately esti-

mates fair market value; rather, it is to determine whether substantial evidence exists to support usage of the chosen method of appraisal.

*Colorado Interstate Gas Company v. Wyoming Department of Revenue,* 2001 WY 34, ¶¶ 9–11, 20 P.3d 528, ¶¶ 9–11 (Wyo.2001) (citations omitted).

[¶ 13] The taxpayers agree that DOR's choice of appraisal methods is subject to the substantial evidence standard.

"In examining the propriety of the valuation method, 'our task is not to determine which of various appraisal methods is best or most accurately estimates [fair market value]; rather, it is to determine whether substantial evidence exists to support usage of the [chosen] method of appraisal.'" *Amoco Prod. Co. v. State Bd. of Equalization,* 899 P.2d 855, 858 (Wyo.1995) (quoting *Holly Sugar Corp. v. State Bd. of Equalization,* 839 P.2d 959, 963 (Wyo.1992)).

*Basin Electric Power Cooperative, Inc. v. Department of Revenue, State of Wyoming,* 970 P.2d 841, 851 (Wyo.1998). However, they also urge that, because the issues they raise in this case involve "the proper application of those methods to the facts, which is an issue of ultimate fact, ... *de novo* review" is required. *Id.* at n. 4. We agree in part. To the extent SBOE's order rests on conclusions of law, we review it *de novo.* However, SBOE's findings regarding the value of intangible property claimed by the taxpayers to be exempt must be affirmed if they are supported by substantial evidence. Section 16–3–114(c). Further, in part because of the complex nature of taxation, we have found there is a presumption the assessment was done correctly by DOR acting in its official capacity. The burden is on the taxpayers to provide the information necessary for DOR to prepare an accurate valuation of the properties and to prove at the contested case hearing before SBOE that the methodology used and valuations reached by DOR were not supported by substantial evidence available in the agency record.

## A. Are Cellular Companies "Telephone Companies" Under § 39–13–102?

[¶ 14] The legislature has determined certain kinds of property shall be val-

ued and assessed by the state through DOR, including "property of telephone and telegraph companies which have more than two thousand dollars ($2,000.00) in assessed value." Section 39–13–102(m)(vi) (amended 2002 Lexis/Nexis). These taxpayers assert they are not telephone companies and should, therefore, be assessed at the county level. The term "telephone company" is not defined in the statutes. Our analysis must begin with a determination of whether the statute is unambiguous. If it is, we must give effect to the plain and ordinary meaning of the language of the statute. *Chevron U.S.A., Inc. v. State,* 918 P.2d 980, 984 (Wyo.1996). "Construction of legislative enactments is only appropriate where the enactment has first been found, as a matter of law, to be ambiguous." *Snake River Brewing Company, Inc. v. Town of Jackson,* 2002 WY 11, ¶ 29, 39 P.3d 397, ¶ 29 (Wyo.2002). A statute is unambiguous if "its wording is such that reasonable persons are able to agree to its meaning." *Petroleum Inc. v. State ex rel. State Board of Equalization,* 983 P.2d 1237, 1240 (Wyo.1999); *see also General Chemical Corporation v. Wyoming State Board of Equalization,* 819 P.2d 418, 420 (Wyo.1991).

[¶ 15] We agree with SBOE's conclusion that the language of the statute which directs "telephone companies" to be assessed and valued by the state is unambiguous. As explained by SBOE,

> To most reasonable people, Petitioners' business is indistinguishable from that of a telephone company. In fact, in today's society, many people use telephone services and cellular services interchangeably. Sometimes, cellular services are utilized in areas where traditional telephone service is not even available.

[Order, ¶ 68] We also observe that many people utilize cellular service in place of wireline service and communication occurs between the two types of service seamlessly.

[¶ 16] In addition to this practical approach to the meaning of "telephone" company, the dictionary definition of "telephone" is "an instrument for reproducing sounds at a distance." *Webster's New Collegiate Dictionary* 1207 (10th ed.1993). No question exists that cellular service meets that definition.

Only when one looks beyond the language of the statute in question can an argument even arise concerning the meaning of the term "telephone." The taxpayers point to an earlier decision of SBOE regarding a two-way paging service in an effort to create such an ambiguity. In *In Re Appeal of Rule Radiophone Service, Inc.,* Wyo. St. Bd. Eq. No. 97–215 (1999), SBOE considered whether a pager service constituted a "telephone company" and concluded it did not. That business had historically been considered a public utility and assessed by the state as such. In 1995, the legislature, in the Wyoming Telecommunications Act of 1995, removed services using radio spectrum or cellular technology from regulation as public utilities for the stated purpose of enhancing competition in the field of telecommunications. Wyo. Stat. Ann. § 37–15–102 (LexisNexis 2001). The only remaining basis for state assessment of the pager service was DOR's position that it also constituted a "telephone" company. SBOE disagreed and in its decision relied in part upon the fact that the pager system used radio spectrum technology. The taxpayers argue that application of the same reasoning to their cellular businesses requires the conclusion that cellular companies are also not "telephone" companies. SBOE, in its order in this case, found important distinctions between a pager service, which it does not consider a "telephone" company, and cellular service. Pager service involves one-way communication whereas cellular service provides two-way, real time communication between large numbers of unrelated persons or businesses. Unlike a pager service, cellular service utilizes land-based wirelines to connect calls to traditional telephone service, and that interconnection occurs using a similar system of telephone numbers including area codes and crosses county and state lines, all unlike a pager service.

[¶ 17] Stacey Sprinkle, Assistant Vice President of Commnet Cellular, testified as follows regarding the nature of cellular services:

> A. The primary purpose of wireless communications is to make and receive communications, whether it be voice or data.

Q. And that's essentially two-way communications?

A. That would be two-way communications.

Q. And they reproduce sounds at a distance, don't they?

A. We do transmit sounds.

Q. And would you agree with me that a cellular phone resembles a telephone?

A. We would like to think that our design is a little bit more flashy and more along the lines of the Star Trek type technology. . . .

Q. And cellular companies provide voice mail services, don't they?

A. Yes they do.

Q. And they provide Caller ID services?

A. Yes they do.

Q. And they provide Call waiting services?

A. That is correct, we provide a lot of similar service.

. . . .

Q. What about an area code, do they operate under the same area code telephone companies operate under?

A. They operate under the same area codes.

[¶ 18] Thomas R. Doutt, the manager of radio frequency design for Verizon, likewise testified:

Q. . . . I want to begin with one of your initial statements was that the majority of cellular calls are mobile to land calls, and by land you mean your basic wire line services; isn't that correct?

A. Yes.

Q. So then would you agree that the majority of cellular calls, then, do encompass the use of wire line technology?

A. Yes.

. . . .

Q. And just so I am not using any of the technology wrong, what exactly—and I've heard the term wire line thrown around in the use of telephone companies. What does that encompass?

A. The term wire line refers to the local telephone company as opposed to wire line/wireless. Cellular is a wireless type of service. The wire line, they have hard-wired facilities that they use.

. . . .

Q. Isn't it true that in just a normal land-to-land call that microwave technology is used. . . .

. . . .

A. Yes.

Q. So it's possible for a land to land to be wireless at some point; isn't that correct?

A. Yes, but not in the same sense that our license is.

. . . .

Q. So the cellular company has to pay for the use of those land lines just like a normal customer would have to?

A. Yes.

[¶ 19] The inescapable conclusion we must draw from this similarity in function between the service provided by wireline or traditional telephone companies and cellular companies is that they both provide "telephone" service. The taxpayers attempt to stretch SBOE's decision in *Rule Radiophone Service* too far. The focus of SBOE's analysis in that case was on whether a pager service was a telephone company. Contained within its discussion of the attributes of a pager service are obvious distinctions between cellular and pager service sufficient to support its conclusion in this case that the plain meaning of "telephone" company includes cellular service companies.

[¶ 20] As further support for their position, the taxpayers suggest that an amendment to the tax statutes adopted by the legislature in 2001, which specifically provided that "telecommunications" companies, defined as including cellular communications, are to be assessed by the state, constituted an expansion of the previous statute and is proof the prior statute did not cover those companies within the meaning of "telephone" companies. This Court has held that, when the legislature enacts a new law, it is presumed it intends to change the law. *State ex rel. Albany County Weed and Pest District*

*v. Board of County Commissioners of County of Albany,* 592 P.2d 1154, 1157 (Wyo.1979). However, this tool of statutory construction is appropriate only if the statutory language is ambiguous, and we have determined "telephone" is a clear and unambiguous term. Even if we consider the amendment as appropriately shedding light on legislative intent in this situation, we do not reach the conclusion suggested by the taxpayers. SBOE characterized this amendment as simply "updating" the language to reflect "the reality of technological changes in the industry." We believe it is more than that. The definition of telecommunications companies not only included cellular companies and companies using any other technology "for hire" to communicate "between or among points specified by the used, or information of the user's choosing without change in the content of the information as sent and received," it also specifically excluded "one-way paging or beeper service" such as Rule Radiophone Service. When the entire amendment is examined, we believe it is fair to conclude the legislature was codifying the *Rule Radiophone Service* decision as well as clarifying its original intent that "telephone" companies included all companies providing broad based two-way communication. *See Rawlinson v. Greer,* 2003 WY 28, 64 P.3d 120 (Wyo.2003). The amendment also verifies that SBOE's conclusion that cellular companies should be assessed by the state is consistent with the tax policy of the state as envisioned by the legislature.

[¶ 21] We acknowledge that other states have decided cellular companies should not be centrally assessed as "telephone companies." In *In re Appeal of Topeka SMSA Limited Partnership,* 260 Kan. 154, 917 P.2d 827 (1996), and *MCI Telecommunications Corporation v. Limbach,* 68 Ohio St.3d 195, 625 N.E.2d 597 (1994), the courts compared cellular companies to pager services or resellers of services and concluded that, since those services were not centrally assessed by the state, the cellular services should not be either. However, in those cases, the courts faced different statutes which raised different questions of statutory interpretation, specifically whether cellular companies were

public utilities and should be regulated as such.

[¶ 22] We find the reasoning of the Kentucky courts more applicable to this case where the term "telephone company" is not defined.

> The only thing that significantly sets cellular telephone companies apart from traditional telephone companies seems to be the technology involved. The means to the end may have changed, but the end remains the same, that is, cellular phone companies are designed and operated to provide telephone service.

*Central Kentucky Cellular Telephone Company v. Commonwealth of Kentucky,* 897 S.W.2d 601, 603 (Ky.Ct.App.1995); *see also Southwestern Bell Mobile Systems, Inc. v. Arkansas Public Service Commission,* 73 Ark.App. 222, 40 S.W.3d 838 (2001); *United States Transmission Systems, Inc. v. Board of Assessment Appeals of State of Colorado,* 715 P.2d 1249 (Colo.1986); *Alabama State Department of Revenue v. Telamarketing Communications of Montgomery,* 514 So.2d 1388 (Ala.Civ.App.1987).

[¶ 23] The plain meaning of the statute includes cellular companies within the categories of property to be assessed by the state. We recognize that result allows DOR to assess and value the property of those companies using the unitary method even though they operate in an unregulated, competitive environment unlike the traditional telephone companies. As is evident later in this opinion, this results in the taxable value of these companies being enhanced by their unregulated income. If this result is not what was intended, we assume the legislature will make its intent known and provide DOR, as well as this Court, with direction on this issue.

**B. Was Exempt Intangible Property Improperly Included in the Valuation of the Cellular Companies?**

[¶ 24] Having concluded that the taxpayers are telephone companies, the statutes require DOR to annually value and assess them at their fair market value. Section 39–13–102(m). DOR used the same procedure as it used for all state assessed companies

and employed the unitary method. This method determines the value of a company as a whole without reference to individual parts. The unitary approach is used in the valuation of properties which derive their value from interdependent assets working together. The market value is not a summation of fractional appraisals but is the value of a company as an operating unit. Department of Revenue Rules and Regulations, ch. 7, § 4(k). DOR obtains all the necessary information to perform the unitary valuation from the taxpayers' annual reports.

[¶ 25] DOR applies the unitary method to state assessed property using one or more of three different methods of data analysis: sales comparison (or market), cost, and income capitalization. *Id.* at § 6. The state appraiser may use one or more of these methods and then correlates the resulting value indicators to arrive at a final estimate of fair market value. *Id.* at § 8. The choice of the appraiser regarding which indicator of value is most appropriate and the final value itself are matters of appraisal judgment with which this Court will not interfere if they are supported by substantial evidence. *Holly Sugar Corporation v. State Board of Equalization for State of Wyoming,* 839 P.2d 959, 963 (Wyo.1992).

[¶ 26] DOR appraisals of all the taxpayers included both the income method and the cost method. In the income method, average operating income for the past three or five years is capitalized to present value at a rate that estimates the rate of return required by investors, or the capitalization rate, and the resulting value represents one measure of value of the operating unit. DOR develops a capitalization rate for the various industries to be used in the appraisal process. The capitalization rate is the ratio between anticipated future income and present value and is used to convert an income stream into a present worth of future benefits. Department of Revenue Rules and Regulations ch. 7, §§ 4(b), 7. DOR determines the capitalization rate annually for all industries after public comment. The primary components of the rate include capital structure and cost of capital for typical companies in the indus-

try. The same capitalization rate was applied to all cellular companies.

[¶ 27] The "historic cost less depreciation" or the "cost" method takes a different approach and considers the net book value of all assets reported by the taxpayer in the annual report considering "all forms of depreciation and appreciation." *Id.* at § 6(b)(ii)(C). The total net book value is then reduced to account for economic obsolescence, and one method of determining the amount of such obsolescence is to compare the rate of return realized by the taxpayer on those assets to the capitalization rate. If the actual rate of return is less than the established industry rate, the value is reduced proportionately. *Id.* at § 4(d).

[¶ 28] During the tax years in question, these taxpayers received a rate of return greater than the capitalization rate for the cellular industry. DOR concluded that return represented an appreciation in the unitary value of the property as defined by the rules. *Id.* at § 4(f). Consequently, DOR made an "economic enhancement adjustment," which is not specifically provided for in the rules, to reflect that appreciation. The adjustment increased the net book value by the same ratio by which the actual rate of return exceeded the industry capitalization rate. The result of the enhancement adjustment was to apply all the enhancement in value caused by the higher income to the assets shown on the annual reports as having book value. The taxpayers did not provide DOR with information in their annual reports regarding a claim that their property included intangible personal property which should have been exempt from taxation. The taxpayers' FCC licenses were obtained without cost and, consequently, had no book value. Neither did their customer base.

[¶ 29] On appeal to SBOE, the taxpayers claimed the enhancement adjustment, without any deduction of the value of intangible property, caused DOR to overvalue their property. They posed two objections to the manner in which DOR applied the valuation methods. First, they contended the purpose of using two different methods—the cost approach and the income approach—was to give the appraiser independent bases upon

which to determine whether a fair value had been fairly determined. If the value indicators calculated by different and independent methods were similar, the appraiser could assume that the two approaches accurately measured the value of the property. However, if they varied widely, the appraiser must determine whether the analysis failed in some respect and reconcile the differences. The taxpayers' argument continues that, in order for the two methods to serve their purpose of providing an independent check and balance, they must not be circular, or based upon the same fundamental assumptions. Such circularity would occur, for example, if the same income figure were utilized in both methods.[2] The taxpayers conceded that DOR utilized historic income in the economic obsolescence/enhancement to the cost method and projected future income in the income method. However, they claimed the use of the obsolescence/enhancement adjustment itself resulted in the same improper circularity because the value arrived at by the cost method with those adjustments would always be virtually the same as that arrived at with the income method, thereby undermining the use of the two methods as independent indicators of value.

[¶ 30]   While we understand the taxpayers' argument and observe the same circularity, we fail to see how that fact alone justifies rejecting DOR's valuation. It is significant that use of two different, independent methods is not required by the rules. Instead, the rules authorize the methods and simply require that "one or more of these approaches shall be used," Department of Revenue Rules and Regulations ch. 7, § 6(b), and direct the appraiser to "consider the relative significance, applicability and appropriateness of the indications of value derived from the ... methods outlined above" and

[W]ill place the most consideration and reliance on the value indicator which, in his

professional judgment, best approximates the value of the subject property. The appraiser shall evaluate all alternative conclusions and correlate the value indicators to arrive at a final estimate of fair market value.

Department of Revenue Rules and Regulations ch. 7, § 8. The record contains voluminous evidence concerning the methods used and the manner in which the judgment of the appraiser was exercised.

[¶ 31]   We also find it relevant that determining economic obsolescence by the same "income shortfall" method is, in fact, specifically authorized by Chapter 7, Section 4(d)(iii)(A) of the Department of Revenue Rules and Regulations and was not objected to by the taxpayers. We assume DOR has applied the income shortfall method of determining economic obsolescence to other taxpayers and, to that extent, some circularity in the appraisal process has been accepted. Further, it is well recognized that the indicators of value are "integrated, interrelated, and inseparable." The Appraisal Institute, The Appraisal of Real Estate 409 (10th ed.1992). Therefore, we discern no legal reason why the adjustment itself is prohibited and find no basis to conclude SBOE's approval of the enhancement adjustment was not supported by substantial evidence.

[¶ 32]   The taxpayers do not dispute their income exceeded the capitalization rate.[3] Instead, they explain the large difference between the net book value—or the cost value indicator—and the value arrived at with the income method as reflecting the value of their intangible assets—the FCC licenses and the customer bases. We find that to be the taxpayers' fundamental complaint in this matter, and we will now turn to that issue.

[¶ 33]   The taxpayers claim their FCC licenses and customer bases constitute intangible personal property which is exempt from taxation pursuant to Wyo. Stat. Ann. §§ 39–11–105(a)(xxix) and 39–11–101(a)(vii) (Lexis-

---

2. An audit was performed in 1994 by David Shank of Ad Valorem Services, Inc. and referred to by this Court in *PacifiCorp, Inc. v. Department of Revenue*, 2001 WY 84, ¶ 15, 31 P.3d 64, ¶ 15 (Wyo.2001), which recommended that DOR use different income figures in a cost and income analysis to avoid such circularity.

3. They do argue the rate should have been adjusted to reflect the flotation cost, but concede that adjustment would not have a significant impact on the values.

Nexis 2001) and the value of that property was improperly included in DOR's valuations. They argue this property is separable and identifiable consistent with our holding in *RT Communications, Inc.*, 11 P.3d 915, and contend they presented sufficient evidence of the value of that property. The taxpayers did not dispute the valuation of the business units as a whole done by DOR using the income method. In fact, their expert agreed that amount was a reasonable estimate of the fair market value of the businesses. However, they argue DOR failed to deduct any value for their intangible property. In theory, the taxpayers suggest the amount by which the total value arrived at using the income method exceeds the net book value, or the residual value, can represent enhancement in value to all the property resulting from the operation of the business as a going concern. However, they contend that en-

hancement should be allocated between the tangible property and intangible property, if any exists. The taxpayers contended their FCC licenses and their customer bases were intangible property and provided expert opinion concerning their respective values. For two taxpayers, those values consumed the entire residual value, and, hence, they claim no enhancement in the value of the tangible assets occurred as a result of those businesses operating as a going concern. In the case of the remaining taxpayers, their intangible asset value was less than the total residual. In those cases, the intangible value was deducted and the remaining residual value was deemed by the taxpayers as representing enhancement of both tangible and intangible property and allocated proportionately. The following table illustrates the taxpayers' argument.

Ernst & Young Alternate Valuation – 12/31/1998

|  | Wyoming 1 | Wyoming 2 | Wyoming 3 |
|---|---|---|---|
| DOR Income Indicator after 5 year Average and Flotation Cost Adjustment | 3,345,271 | 2,852,941 | 15,654,412 |
| Net Book Value (NBV) | 2,562,123 | 2,301,782 | 6,075,294 |
| Goodwill and Intangibles | 783,148 | 551,159 | 9,579,118 |
| | | | |
| Less Intangible Adjustments: | | | |
| FCC License | 1,551,887 | 2,435,516 | 4,536,497 |
| Customer Base | 875,520 | 956,160 | 2,126,880 |
| Total Unimpaired Value of Intangibles | 2,427,407 | 3,391,676 | 6,663,37 7 |
| | | | |
| Value of Intangibles | 783,148 | 551,159 | 6,663,377 |
| Goodwill (i.e.Enhancement) | 0 | 0 | 2,915,741 |
| Enhancement Percent of Enterprise Value | 0.00% | 0.00% | 22.89% |
| | | | |
| Allocation of Enhancement to Tangible Assets | 0 | 0 | 1,390,568 |
| Allocation of Enhancement to Intangible Assets | 0 | 0 | 1,525,173 |
| | 0 | 0 | 2,915,741 |
| | | | |
| Total Tangible Asset Value (Enhanced) | 2,562,123 | 2,301,782 | 7,465,862 |
| Total Intangible Asset Value (Enhanced) | 783,148 | 551,159 | 8,188,550 |
| Enterprise Value | 3,345,271 | 2,852,941 | 15,654,412 |

Ernst & Young Alternate Valuation—12/31/1999

|  | Wyoming 1 | Wyoming 2 | Wyoming 3 | AirTouch |
|---|---|---|---|---|
| DOR Income Indicator after 5 year Average and Flotation Cost Adjustment | 3,661,130 | 3,492,824 | 17,116,279 | 20,458,472 |
| Net Book Value (NBV) | 2,616,513 | 2,152,092 | 7,292,314 | 6,741,070 |
| Goodwill and Intangibles | 1,044,617 | 1,340,732 | 9,823,965 | 13,717,402 |
| | | | | |
| Less Intangible Adjustments: | | | | |
| FCC License | 1,563,179 | 2,464,660 | 4,571,978 | 6,690,336 |

| | | | | |
|---|---|---|---|---|
| Customer Base | 881,891 | 967,602 | 2,143,515 | 3,981,282 |
| Total Unimpaired Value of Intangibles | 2,445,070 | 3,432,262 | 6,715,493 | 10,671,618 |
| Value of Intangibles | 1,044,617 | 1,340,732 | 6,715,493 | 10,671,618 |
| Goodwill (i.e.Enhancement) | 0 | 0 | 3,108,472 | 3,045,784 |
| Enhancement Percent of Enterprise Value | 0.00% | 0.00% | 22.19% | 17.49% |
| Allocation of Enhancement to Tangible Assets | 0 | 0 | 1,618,237 | 1,179,131 |
| Allocation of Enhancement to Intangible Assets | 0 | 0 | 1,490,235 | 1,866,653 |
| | 0 | 0 | 3,108,472 | 3,045,784 |
| Total Tangible Asset Value (Enhanced) | 2,616,513 | 2,152,092 | 8,910,551 | 7,920,201 |
| Total Intangible Asset Value (Enhanced) | 1,044,617 | 1,340,732 | 8,205,728 | 12,538,271 |
| Enterprise Value | 3,661,130 | 3,492,824 | 17,116,279 | 20,458,472 |

[¶ 34] DOR had three objections to the taxpayers' position on intangible property, all of which SBOE found persuasive. First, relying on its interpretation of language in *RT Communications,* DOR contended intangible property is not exempt if it is "necessary" or "integral" to the operation of the business and the FCC licenses and the customer bases were both. Second, DOR contended the taxpayers' evidence supporting the values they derived for the FCC licenses and the customer base was insufficient. Finally, DOR argued the evidence was not provided to it for use during the valuation process and, consequently, could not support a challenge to the propriety of that valuation.

[¶ 35] Our analysis of this issue must begin with the statute which creates the exemption for intangible property. Section 39–11–105(a)(xxix) provides intangible personal property is exempt from taxation. Section 39–11–101(a)(vii) states intangible property "includes":

(A) Money and cash on hand including currency, gold, silver and other coin, bank drafts, certified checks and cashier's checks;

(B) Money on deposit;

(C) Accounts receivable and other credits;

(D) Bonds, promissory notes, debentures and other evidences of debt;

(E) Shares of stock or other written evidence of ownership;

(F) Judgments for the payment of money;

(G) Annuities and annuity contracts.

[¶ 36] Both SBOE and this Court have found this statutory list of the types of property "included" within the meaning of "intangible" is not exclusive. *RT Communications, Inc.,* 11 P.3d at 922. We characterized items that would fall within this statutory category as having "no inherent value in and of themselves, but instead represent value" and suggested that intangible property could include certificates of convenience and franchise rights. *Id.* at 923. At the same time, in *RT Communications,* we also held that the statutory exemption for intangible property did not prohibit DOR from valuing a telephone company using the unitary method which by its very nature captures the intangible value of the property generated by operating as a unit. We described this result as necessary both because the intangible value is obvious when businesses operate as combined units across governmental boundaries and because separating the value of intangible property from that of tangible property can be very difficult, if not impossible. This dichotomy—that intangible property is both exempt and yet taxable to the extent it enhances the value of taxable property—creates a mind-bending exercise when one attempts to wrestle with a specific fact situation such as the one presented in this case. The *RT Communications* decision up-

held DOR's and SBOE's decisions to value the taxable property of the telephone company in question by including the value of certain intangible property represented by the "acquisition adjustment"[4] because the evidence proved the intangible property enhanced the value of the tangible property and the company failed to present evidence that the value of the intangible property could be, or had been, identified or separated.

[¶ 37] DOR and SBOE relied in part on *RT Communications* to impose an additional prerequisite to the exemption of intangible property—that it cannot be integral or necessary to the business in question. We find no authority for that additional requirement in either the statutes or the *RT Communications* opinion. In fact, several statutory examples of exempt intangible property, such as working capital, are arguably "integral and necessary" to the operation of the business as a whole. We understand the policy concern of the taxing authorities that excluding the value of intangible property which is necessary for the business could theoretically reduce the value of the business to the net book value of the hard assets, and thereby reduce the taxes paid. However, legislative intent governs the interpretation of a statute, not whether more or less taxes are collected. The legislature establishes tax policy, and that policy often involves the creation of certain exemptions which, if applied as intended, result in less tax revenue. We have not been provided with much guidance, beyond the language of the statute itself, concerning what the legislature intended with regard to this issue. The statute unambiguously exempts all intangible property from taxation. DOR cannot refuse an exemption simply because it concludes the intangible property is "integral" to the business. When we stated in *RT Communications* that all intangible property which was "separable and identifiable" must be excluded, we were not imposing conditions on the exemption but were only stating the obvious. If intangible property cannot be identified and separated from the business unit as a whole, it cannot be excluded from taxation. Therefore, we hold DOR and SBOE exceeded their statutory authority when they imposed the requirement that intangible property, which is necessary and integral to the operation of a business, cannot be exempt from taxation.

[¶ 38] However, our consideration of this issue does not end with that statutory analysis. Even if the FCC licenses and the customer bases were intangible property validly exempt from taxation, the burden falls on the taxpayers to prove the value of that property was identifiable and separable from the enhanced value of the business determined through the unitary method. DOR contended the taxpayers failed to carry that burden in two ways. First, they failed to provide DOR with the necessary information to support their claim at the time they filed their annual reports which were the basis for DOR's valuation even though the forms requested such information. Most of the information that formed the basis of the taxpayers' claimed value for the intangibles was available to them at the time they filed the annual report and had been included in the contemporaneous reports they filed with the federal Securities and Exchange Commission. However, not until over a year after the value had been certified to the counties did the taxpayers provide the information to DOR in the form of an independent appraisal. For the 1999 tax year, the taxpayers (excluding Airtouch) did request an informal conference allowed under the rules and asked for a reduction in the valuation for the intangible property. However, they did not identify that property or its value. After that conference, DOR reduced the income portion of the valuation formula by ten percent which resulted in lower valuations. In 2000, none of the taxpayers requested an informal conference because, as they testified, they considered it to be a futile effort.[5]

---

4. The acquisition adjustment was that portion of the purchase price which exceeded the book value of the tangible assets paid by the companies in question for the acquisition of their predecessors.

5. Apparently, prior to the publication of our opinion in *RT Communications,* DOR maintained its position that the statutory list of intangible property was exclusive, and the taxpayers believed information submitted to support a value for other types of intangible property would be ignored.

[¶ 39] A striking similarity exists between the failure of the taxpayers in this case to supply the necessary information to support their contentions to DOR during the valuation process and the failure of the taxpayers in *RT Communications* to do the same. As we stated in *RT Communications*, "The Telephone Companies are ill positioned now to complain that DOR failed to perform an analysis when they failed to provide the necessary information." 11 P.3d at 927. While it may be true this failure was due to the evolutionary process of addressing intangible property in the rapidly developing telecommunications business, DOR was not provided information on the separate value of the FCC licenses and the customer lists and cannot be faulted for failing to generate that information on its own especially given the self-reporting nature of Wyoming's tax system as it relates to state assessed property. *Id.;* State Board of Equalization Rules, Ch. 2, § 20; *Amoco Production Company v. Wyoming State Board of Equalization,* 899 P.2d 855, 858 (Wyo.1995); *Gray v. Wyoming State Board of Equalization,* 896 P.2d 1347, 1350 (Wyo.1995).

[¶ 40] Finally, DOR contends that, even if the information had been available in a timely fashion, it did not fairly establish the value of the FCC licenses and the customer lists. With regard to the FCC licenses, the taxpayers obtained their FCC licenses for analog and digital service through a lottery at no cost. In an attempt to prove a separable and identifiable value for these licenses, their expert provided prices that were paid for a different type of FCC licenses auctioned in 1996 to provide greater capacity for wireless communications services nationwide.[6] None of those new "PSC" licenses were issued in Wyoming in the 1996 auction. The taxpayers' expert testified that he considered those auctions which occurred in areas with populations under one million to be "comparable to the state of Wyoming." He excluded larger population areas because higher prices were paid in those areas as a result of the value of population density. He then estimated a price per population of $34 which he believed would be representative of the taxpayers' license areas. However, the range of prices paid for licenses in areas with populations under 100,000, which is certainly more representative of the areas in question, was from $12.72 to $19.72.[7] No licenses were auctioned for areas with populations similar in size to the taxpayers' license areas.[8] The taxpayers' expert also considered the prices paid for similar licenses auctioned in 2001 as a "gut check" albeit after the tax years in question. In that year, three PSC licenses were issued for Cheyenne for prices ranging from $24.91 to $34.49. No explanation was provided with regard to those licenses as to the purchaser or the population served. This $34 price per customer, which was substantially higher than any price paid for PSC licenses in 1996 for population areas under 100,000, was then applied to the taxpayers' customer base to determine the value of the taxpayers' licenses.

[¶ 41] DOR contended the type of licenses auctioned was different than the type of those held by the taxpayers and no evidence was provided that any secondary market for the taxpayers' FCC licenses existed. Neither DOR nor SBOE was convinced the prices paid for a different type of FCC license in different geographical areas accurately represented the value of the taxpayers' FCC licenses which were acquired by lottery and without the payment of a purchase price. No information in the taxpayers' financial statements indicated a separate value for the licenses.

[¶ 42] With regard to the value of the customer lists, the taxpayers based their

---

**6.** In 1996, the FCC began issuing licenses for line-of-sight communications like cellular at slightly higher frequencies known as personal communication services which are digital only.

**7.** Information regarding the auction prices used by the taxpayers' expert in his analysis was contained in Exhibits 100 and 101 which SBOE refused to admit. However, SBOE did allow substantial testimony concerning the analysis and how it was utilized by the expert specifically including the FCC auctions, and that information was publicly available at the time of DOR's valuation.

**8.** Of the fifty-one licenses auctioned in 1996 for areas under one million in population, only four were under 100,000.

claim of value on the after-tax costs incurred to acquire the customers on a per customer basis. Again, while this information was available to the taxpayers and included in their federal filings, it was not provided to DOR in the annual reports. In addition, DOR argued these costs were already deducted as expenses and allowing the taxpayers to again deduct them as the value of intangible property resulted in a double deduction. SBOE seemed to agree with this reasoning.

[¶ 43] We fail to understand the logic of DOR's contention that a double deduction would result given the treatment of depreciation, which is both an expense deduction as well as a deduction in the Historic Cost Less Depreciation approach to valuation recognized with approval in the rules. Department of Revenue Rules and Regulations, ch. 7, § 6(b)(ii)(C). However, in addition to the concern about its treatment as an expense, SBOE stated it was not convinced these costs fairly represented the value of the customer lists. Although the taxpayers suggested customer lists could be bought and sold, they provided no evidence concerning prices or methods of valuation of this asset in similar markets.

[¶ 44] SBOE's reasons for rejecting the taxpayers' value for the licenses and the customer bases were clearly stated in its findings. The standard of review applicable to these factual findings directs that we not substitute our judgment for that of the agency. No opposing evidence regarding the value of the licenses or the customer lists was presented by DOR and, consequently, according to *Newman*, 2002 WY 91, ¶ 22, 49 P.3d 163, we apply the arbitrary and capricious standard. The taxpayers carried a heavy burden of proof, and the agency was entitled to the presumption that its position was fair and reasonable. *Colorado Interstate Gas Company*, 2001 WY 34, ¶ 10, 20 P.3d 528. DOR and SBOE provided a full explanation of their reasons for rejecting the taxpayers' evidence on this issue and were not arbitrary or capricious in doing so.

[¶ 45] In a somewhat inconsistent argument, DOR, while claiming the intangible property was necessary and integral to the businesses, argued the taxpayers failed to prove the value of the intangible property was actually captured in the valuation of the businesses as a unit. Given the income from the entire business is a crucial element in both the cost (with the enhancement adjustment) and income methods of valuation, that income necessarily is attributable, at least in some degree, to the FCC licenses and the customer lists. Consequently, it appears logical to us that the value of those items was captured in the valuation. *See GTE Sprint Communications Corporation v. County of Alameda*, 26 Cal.App.4th 992, 32 Cal.Rptr.2d 882 (1994); Michael E. Green & Terrence J. Benshoof, Exclusion of Intangibles From The Unit Value, 1 St. Tax Notes 547 (1991). However, we need not resolve this factual dispute because we agree that the taxpayers cannot criticize DOR's failure to deduct the value of the intangibles when they provided no information allowing those values to be determined. Further, the state of the record in this case does not support a finding that the action of SBOE or DOR was arbitrary or capricious in rejecting on its merits the evidence ultimately submitted by the taxpayers. *Newman*, 2002 WY 91, 49 P.3d 163.

[¶ 46] We feel compelled to observe that, while claiming DOR failed to perform an analysis of the value of these intangible assets, the taxpayers' own expert testified he had never performed such an analysis for wireless companies before for purposes of property tax because the companies he had analyzed were locally assessed and the issues he had historically dealt with in the property tax context with wireless companies were related to depreciation and not valuation of intangibles. He further observed, "the appraisal of the intangibles has evolved over the last several years primarily because it's becoming a much more significant asset for companies." It seems obvious and free from debate that the FCC licenses and the customer bases enhance the value of the taxpayers' tangible property, and, as we noted in *RT Communications*, that value is taxable. Yet, the methods of valuation of the intangibles adopted by the taxpayers resulted in such large values that they consumed most and, in some cases, all of that enhanced value

and, as a result, simply seemed to lack credibility. We do not intend to infer through this opinion that governmental licenses, franchises, and customer lists can never be considered exempt intangible property. Instead, the taxpayers' methods of valuation of intangible property must be realistic and cannot simply serve as a means of sheltering from taxation all enhanced value of the taxable property which is fairly attributable to the business operating as a going concern.

## C. Flotation Rate Adjustment

▌ [¶ 47] The taxpayers argued SBOE erred when it failed to require the capitalization rate utilized in the valuations to be adjusted to reflect a flotation cost adjustment. Flotation costs are those costs associated with the issuance of new debt and equity securities. *In re Appeal of Wyoming Interstate Company, LTD*, Wyo. St. Bd. Eq. No. 99–75, ¶ 10 (Feb. 28, 2001). As noted above, prior to preparing its final valuations for the taxpayers, DOR conducts a capitalization rate study for the different categories of businesses valued with the unitary method. The rate is developed by DOR after consulting various sources of information concerning the industry's financial condition including input from the taxpayers themselves and is intended to reflect the rate of return that is expected within the industry. DOR rules establish the procedures for the development of the capitalization rate and require a public meeting annually at which public comments are received. Department of Revenue Rules and Regulations ch. 7, § 7.

[¶ 48] In this process for cellular companies, the taxpayers presented information supporting a flotation cost adjustment; however, DOR issued the capitalization rate without one. When the taxpayers filed their notice of appeal from their final valuation, they did not include the issue of the capitalization rate. However, on January, 4, 2001, they filed an "Updated and Consolidated Preliminary Statement" in which the proper capitalization rate was specifically raised.

One month later, SBOE issued its decision in a separate case, *In re Appeal of Wyoming Interstate Company, LTD*, Wyo. St. Bd. Eq. No. 99–75, ¶ 22 (Feb. 28, 2001), in which it held DOR should allow flotation cost adjustments finding, "The conclusion is the buyers need for capital in the form of flotation costs must be included in the capitalization rate calculation." Thereafter, DOR took the position that it would allow the adjustment for all taxpayers beginning with the 2001 tax year and immediately for all taxpayers who had cases on appeal. In a document entitled "Notice of Amendment of Annual Reports" filed on June 13, 2001, five months before the hearing, the taxpayers stated it was "their wish to hereby confirm formally that they request additional changes to [DOR's] appraisals to reflect the flotation cost adjustment to the capitalization rate recognized in the recent Board of Equalization decision." [9]

[¶ 49] On September 7, 2001, almost a month before the SBOE hearing, DOR sent new certifications of value for the taxpayers for the tax years under appeal to the respective county assessors which certifications were based upon different capitalization rates because the taxpayers "should be granted additional financing costs for Flotation Costs." At the same time, DOR also moved to dismiss this appeal contending the original valuations were moot. The taxpayers opposed that effort because they wanted resolution of the other issues raised in their appeal and apparently assumed the flotation cost issue had been conceded. On the basis of this record, we cannot determine whether the county assessors made the adjustment which would, of course, cause this issue to be moot. However, since neither party made such an argument, we must presume the amended valuations have not resolved the issue, and so we will resolve it herein.

[¶ 50] SBOE found that, because the flotation rate issue was not raised in the notice of appeal and the summaries of updated contentions were never formally amended to

---

9. DOR contends that, unlike the severance tax statutes, the ad valorem statutes do not provide for amended annual reports. While the form of the pleading may be objected to, it did provide adequate notice concerning the issues which the taxpayers proposed to raise in the hearing. We do note that DOR issued amended certificates of value which is also not directly authorized by statute but apparently has been accepted practice.

raise the capitalization rate, the issue was not properly before SBOE. Relying on *Dan's Supermarket v. State ex rel. Wyoming Workers' Safety and Compensation Division*, 2001 WY 104, 33 P.3d 1121 (Wyo.2001), SBOE concluded the issues before it were limited to those raised in the pleadings. However, that case involved an issue which was not raised in any fashion by the parties. As the opinion noted,

> We have previously ruled that "[p]leadings are used to give parties notice of the nature of claims and defenses, to narrow the issues, and to guide the parties and the court in the conduct of the case. If the pleadings and notice of hearing are to mean anything in a contested case hearing, the hearing examiner must be limited to considering only those issues presented in the notice and pleadings." *Ireland v. State ex. rel. Wyo. Workers' Comp. Div.*, 998 P.2d 398, 401 (Wyo.2000) (citations omitted).

2001 WY 104, ¶ 15, 33 P.3d 1121. The primary concern in both *Dan's Supermarket* and *Ireland v. State ex rel. Wyoming Workers' Compensation Division*, 998 P.2d 398 (Wyo.2000), was to ensure all parties are on notice by way of the pleadings concerning what issues will be considered at contested case hearings. This record demonstrates that test was met on the issue of the flotation costs. The taxpayers raised the proper capitalization rate in their filings, and, in fact, the flotation cost adjustment was specifically raised in the taxpayers' "Notice of Amendment of Annual Reports" and in DOR's motion to dismiss. Therefore, SBOE should have addressed the issue on the merits.

[¶ 51] SBOE had previously ruled such an adjustment should be made for all other taxpayers, and DOR stated its intent to do so with cases on appeal. While the taxpayers may well be subject to criticism for not raising it in their notice of appeal as well as not formally amending all their later prehearing pleadings, DOR's actions, first conceding the issue in its motion to dismiss and then, when the motion was not granted, claiming no adjustment was warranted, smacks of gamesmanship not appropriate in a process which seeks to fairly value property subject to taxation. While the adjustment may not result in a substantial change in the valuation, if the facts warranted it, as was apparent here from the actions of both SBOE and DOR, it should have been made. SBOE's rejection of the adjustment was arbitrary and capricious and must be reversed.

### D. Exclusion of Taxpayers' Appraisals from Evidence

[¶ 52] At the hearing, SBOE ruled certain evidence offered by the taxpayers concerning the value of the claimed intangible property, which was unavailable to DOR at the time it completed its valuation, was inadmissible as irrelevant to the issue of whether DOR's valuations were proper. The taxpayers complain that ruling denied them a meaningful right to be heard. DOR responds that SBOE has broad discretion concerning evidentiary matters, most of the evidence concerning the claimed value of intangible property was admitted, and SBOE properly excluded evidence that was not available to DOR since SBOE's role is not to determine valuations itself but only to review the actions of DOR.

[¶ 53] SBOE rejected the taxpayers' proffered Exhibit Nos. 100 and 101 which were appraisals, including the value of intangible property, completed by their expert on the basis of information that, in part, was not available to DOR, either from annual reports filed by the taxpayers or other publicly available sources. SBOE stated,

> The primary basis for that decision is that the appraisal information ... the information used in these appraisals was information not available to DOR for their preparation of appraisals, that because this additional information was used, and in fact, methodology was applied that DOR itself could not have applied, we find that these appraisals are not relevant. It does not, however, limit Mr. Hoemke's discussion of his review of DOR's appraisals and the problems he saw with respect to those.

The hearing examiner later clarified the expert would be allowed to testify,

> [H]ow he identified intangibles, how under appraisal methodology currently accepted

he would have valued those intangibles, what information that he would need to value those intangibles and whether or not that information was readily available from the company at the appraisal dates.

[¶ 54] The taxpayers concede their expert was allowed to testify regarding the appraisals to the extent the information was available to DOR. In addition, he was allowed to testify concerning the methodology he used in the excluded Exhibit Nos. 100 and 101 and even the values he derived in those exhibits. Yet, the taxpayers complain he was not allowed to "show the path to reach those conclusions" because that path involved information not available to DOR when its appraisals were completed. No suggestion is made that the excluded evidence would have addressed the reasons given by SBOE for rejecting the claim of value for the intangible property. However, the taxpayers seek our review of this issue because of its potential impact in the future.

[¶ 55] We start with the proposition that administrative agencies have broad discretion with regard to evidentiary matters in contested case proceedings. *Clark v. State ex rel. Wyoming Workers' Safety and Compensation Division*, 968 P.2d 436, 439 (Wyo.1998); *State ex rel. Wyoming Workers' Compensation Division v. Rivera*, 796 P.2d 447, 451 (Wyo.1990). The issue before SBOE in this matter was not what the proper value of the taxpayers' property was but was to determine whether or not the methodology employed by DOR was correct. *Amoco Production Company v. Wyoming State Board of Equalization*, 12 P.3d 668 (Wyo.2000). SBOE's evidentiary ruling did not impair the taxpayers' due process right to a full and fair hearing on that issue. *See Amoco Production Company v. Wyoming State Board of Equalization*, 7 P.3d 900 (Wyo.2000).

It is well established in Wyoming that with regard to an agency's decision on the admission or exclusion of evidence and testimony, such is left within the sound discretion of the agency. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. An abuse of discretion has also been said to have occurred only when the decision shocks the conscience of the court and appears to be so unfair and inequitable that a reasonable person could not abide it.

*Sinclair Oil Corporation v. Wyoming Public Service Commission*, 2003 WY 22, ¶ 41, 63 P.3d 887, ¶ 41 (Wyo.2003) (citations omitted).

### E. Is Valuation of Cellular Companies Rational and Uniform?

[¶ 56] The taxpayers suggest the valuation of their property arrived at by DOR may not meet the mandate of Article 15, Section 11 of the Wyoming Constitution which we have interpreted to mean "a rational method (of appraisal), equally applied to all property, which results in essential fairness." *Holly Sugar Corporation*, 839 P.2d at 963. The thrust of this argument is that, because other businesses such as cable television companies and internet service providers are locally assessed, they do not pay property taxes on the intangible value their property may have acquired from operating as a unit, as measured by the unitary method of valuation. As an example, the taxpayers cite to a SBOE decision rejecting a local assessor's efforts to apply the unit valuation method to a cable television company. *See In re Appeal of TCI Cablevision of Wyoming, Inc.*, Wyo. St. Bd. Eq. No. 92–264 (1993). They also argue other franchise businesses do not pay tax on the intangible value of their franchise. They point out that, even though they have aging analog equipment, they are earning high returns on investment "because they essentially have no booked investment in their licenses and customer-base assets." While complaining that the valuation resulting from the enhancement adjustment was improper, they concede that some of that value may constitute enhancement of the tangible property, which is properly taxable.

[¶ 57] The taxpayers do not provide a cogent argument or persuasive authority in support of their somewhat after-the-fact constitutional claim. Without that, we

will not consider this argument. *Conner v. Board of County Commissioners, Natrona County,* 2002 WY 148, ¶ 13, 54 P.3d 1274, ¶ 13 (Wyo.2002). We respectfully suggest these arguments are more suited to the legislative forum. All those involved in this issue suffer from a lack of clear rules and procedures regarding how to treat companies with unregulated income, such as these cellular companies, which are valued with the unitary method. The legislature has directed they are to be valued and assessed by DOR and has also required that the value of intangible property be excluded from taxation. In *RT Communications,* we stated the obvious that, if intangible property could be identified and separated, the statutes required it to be excluded from taxation. How that is to be accomplished must be determined by the legislative and executive branches of government, not by the courts. We note that, when this issue arose in California, the legislature did respond with clear direction. Cal. Rev. & Tax.Code § 110 (1996).

[¶ 58] An additional comment is appropriate. In both *RT Communications* and this case, we affirmed DOR's valuation while, at the same time, recognizing the statutes provide intangible property is exempt from taxation and such property is not limited to the statutory list of examples. Central to our conclusion in both cases was the taxpayers' failure to provide sufficient evidence to DOR in the valuation process to allow it to determine the value of the intangible property. We observe this is likely a result of the embryonic nature of this issue, and we predict the time will soon come when that reason for the rejection of an intangible property deduction will no longer exist. If a taxpayer identifies intangible property during the valuation process and provides sufficient information to DOR to allow the value of that property to be determined using accepted valuation methods, DOR cannot lawfully refuse to give effect to the statutory exemption. The valuation methods utilized by the taxpayers' expert in this case to value the FCC licenses were not challenged by DOR. Its objections were focused instead on timeliness and appropriate input data. These shortcomings can, and likely will, be addressed in the future.

[¶ 59] Consequently, we urge either DOR on its own through rulemaking or the legislature through statutory amendments to directly address how the intangible property of companies whose income is unregulated should be valued and either taxed or exempted from taxation. Resolution of this issue is better suited to the legislative and executive branches of government than to case-by-case adjudication by the judiciary without the benefit of public debate.

[¶ 60] Affirmed in part, reversed in part, and remanded.